ACCEPTED
03-13-00498-CV
4451721
THIRD COURT OF APPEALS
AUSTIN, TEXAS
3/11/2015 10:14:08 AM
JEFFREY D. KYLE
CLERK

# LAW OFFICE OF DON CRUSE

1108 Lavaca Street      (512) 853-9100
Suite 110-436      (512) 870-9002 *fax*
Austin, Texas 78701      don.cruse@texasappellate.com

**BY E-MAIL**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

3/11/2015 10:14:08 AM

JEFFREY D. KYLE
Clerk

March 9, 2015

Jeffrey D. Kyle
Clerk of the Court
Third Court of Appeals
Price Daniel Sr. Building
209 West 14th Street, Room 101
Austin, Texas 78701

     Re:      *Lawson v. Keene*, No. 03-13-00498-CV

Dear Mr. Kyle:

     Please forward this Rule 38.7 letter to the panel.

TO THE HONORABLE COURT:

A question in this appeal is whether a fraud claim is barred if a plaintiff might, by some investigation, have uncovered the deception. The Appellees contend that would absolutely bar any fraud claim. *See* Appellee Br. 21–25. The Lawsons believe that misstates Texas law by confusing the limitations clock with liability elements. *See* Appellant Br. 30–33.

In January 2015, the Texas Supreme Court issued two decisions bearing on the question: *Hooks v. Samson Lone Star, LP*, No. 12–0920 (Tab A), and *National Property Holdings, LP v. Westergren*, No. 13–0801 (Tab B).

### (1) *Hooks* confirms that there is no reasonable investigation element to fraud liability

*Hooks* was a fraud limitations case. The question was whether certain public oil-and-gas filings would start the limitations clock. Hooks and some amici pointed to the Court to the principle that a fraud plaintiff need not make their own inquiry into the facts:

> Hooks and amicus Cardwell, Hart & Bennett, LLP cite cases stating that if there is a fraudulent misrepresentation, it is no defense that proper inquiry might have revealed the truth. *See, e.g.,*

Page 1

*Buchanan v. Burnett*, 119 S.W. 1141, 1142 (Tex. 1909); *Labbe v. Corbett*, 6 S.W. 808, 811 (Tex. 1888); *Mitchell v. Zimmerman*, 4 Tex. 75, 79–80 (1849).

Slip op. at 7n.6. The Court responded by drawing precisely the distinction suggested by the Lawsons here:

> These cases, however, stand for the general proposition that **one may be liable for fraud even if it could be discovered by due diligence**; they do not hold that limitations is extended even if due diligence would reveal the fraud.

Slip op. at 7 n.6 (emphasis added). *Hooks* thus reaffirms "the general proposition" that "one may be **liable** for fraud" even where the deception could, hypothetically, have been "discovered by due diligence." *Id.* (emphasis added); *see also* Appellant Br. 32 & n.13.

*Hooks* should also dispel Appellees' suggestion that the Court ignore this principle based on a spurious distinction between "fraud" and "fraudulent inducement." *Cf.* Appellee Br. 22–23. While discussing limitations, *Hooks* explained that fraudulent inducement was "a subspecies of fraud" and thus "[t]he same rule applies." *Hooks*, slip op. at 6. The same basic liability principles should apply as well.

### (2) *Westergren* is not to the contrary and, if anything, confirms how narrowly *Thigpen* should be applied

Appellees contend that the Lawsons "had a duty under *Sierra*" to make an investigation of any representations and that any failure to do so would defeat a fraud claim. *See* Appellee Br. 22–25. They trace that idea to *Thigpen v. Locke*, 367 S.W.2d 247 (Tex. 1962). *See* Appellee Br. at 22 (noting that *Sierra* relied on *Thigpen*); *see also* Appellant Br. 32-33 (same).

On January 9, the Supreme Court issued a new decision applying *Thigpen*. That case, *National Property Holding, LP v. Westergren*, involved a fraud plaintiff (Westergren) who sued over some promises that were directly contradicted by contract terms. Slip op. at 5-6. The *Westergren* Court cited *Thigpen* to support its narrow holding that a person cannot base a fraud claim on promises about what a contract actually says: "as Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations **regarding** the contract's unambiguous terms." Slip op. at 6 (emphasis added). That situation is not presented here.

The possible relevance here is that *Westergren*, like *Sierra Associate*, quotes some language from *Thigpen* that—if read in isolation—seems to suggest a much broader rule. Slip op. at 7 ("In an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests . . . . [A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party.").

Traced to its origin, that parenthetical quote comes from a case about when limitations begins to run, not whether a party is liable.[1] *See* Appellant Br. 32 & n.13 (discussing *Courseview, Inc. v. Phillips Petroleum Co.*, 312 S.W.2d 197 (Tex. 1957)). As discussed earlier in this letter, a party's duty to investigate is broader in the context of limitations than for liability.

And *Thigpen* was soon followed by *Isenhower v. Bell*, which squarely held that "the person committing the fraud cannot defeat a claim for damages based upon a plea that the party defrauded might have discovered the truth by the exercise of proper care." 365 S.W.2d 354, 357 (Tex. 1963). These cases overlapped: *Thigpen* was issued in December 1962; *Isenhower* in February 1963. It is hard to believe that *Thigpen* was meant to announce the opposite rule of law; even if so read, *Isenhower* would supersede it.

The same dynamic holds for *Westergren* and *Hooks*, decided just three weeks apart. It is difficult to believe that *Westergren* was meant, by inclusion of a parenthetical quotation, to alter the law. And even if so read, the later-decided *Hooks* case would supersede it.

These cases can instead be read in harmony: Fraud plaintiffs, like anyone else, are charged with knowing a contract's terms so cannot claim to have been misled about those unambiguous terms (*Westergren* and *Thigpen*), but they are **not** charged with investigating the very facts in the world about which they have been deceived (*Hooks* and *Isenhower*).

Respectfully submitted,

Don Cruse
State Bar No. 24040744

---

[1] The sentence immediately preceding the quoted language confirms that context. *Courseview*, 312 S.W.2d 197, 204-05 (Tex. 1957) ("The rule is well settled that the statute of limitations begins to run at such time as the fraud is discovered, or by the exercise of reasonable diligence might have been discovered.").

## CERTIFICATE OF SERVICE

I certify that on March 11, 2015, this Rule 38.7 Letter was sent by electronic service to appellate counsel of record:

D. Todd Smith
SMITH LAW GROUP, P.C.
1250 Capital of Texas Highway South
Three Cielo Center, Suite 601
Austin, Texas 78746
*Lead Counsel for Appellees*

/s/ Don Cruse

_____

Don Cruse

# Tab A

**Hooks v. Samson Lone Star, LP
No. 12-0920 (Tex. Jan. 30, 2015)**

# IN THE SUPREME COURT OF TEXAS

════════════

No. 12-0920

════════════

CHARLES G. HOOKS III, ET AL., PETITIONERS,

v.

SAMSON LONE STAR, LIMITED PARTNERSHIP, N/K/A SAMSON LONE STAR LLC,
RESPONDENT

════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIRST DISTRICT OF TEXAS

════════════════════════════════════════════════════

**Argued September 17, 2014**

JUSTICE DEVINE delivered the opinion of the Court.

In this oil and gas appeal, we consider whether a mineral owner's claims of fraud and breach of contract in the leasing and pooling of his mineral interests are, as a matter of law, barred by limitations. A jury determined that the mineral owner, in the exercise of reasonable diligence, discovered the fraud less than four years before filing suit, and the trial court accordingly concluded that the claims were not barred by limitations. The jury also found fraud and damages in the mineral owner's favor, and the trial court rendered judgment on the jury's verdict. The court of appeals, however, reversed most aspects of the mineral owner's judgment, concluding that the fraud should have been discovered, as a matter of law, more than four years before the mineral owner filed suit

because the relevant information was available in the Texas Railroad Commission's public records. 389 S.W.3d 409, 429–30, 439–40 (Tex. App.—Houston [1st Dist.] 2012).

While we agree that public records may under certain circumstances establish a lack of diligence in the discovery of fraud as a matter of law, here the records themselves were tainted by fraud and thus provide no conclusive proof on the subject. Because we conclude that the mineral owner's diligence in discovering the underlying fraud was in this instance a question of fact for the jury, we reverse the court of appeals' judgment on this and other issues in part, affirm its judgment on other issues in part, and remand the cause to the court of appeals for review of a factual sufficiency of the evidence complaint and other issues not considered because of the court's ruling on limitations.

## I. Background and Procedural History

Charles G. Hooks III ("Hooks")[1] sued Samson Lone Star Limited Partnership, now known as Samson Lone Star, LLC ("Samson"), in 2006,[2] alleging, among other things, breach of contract and failure to pay royalties under Texas Natural Resources Code section 91.404. Later amendments to Hooks' petition included allegations of fraud, fraudulent inducement, and statutory fraud. These claims centered on three oil and gas leases that Hooks, the lessor, executed with Samson, the lessee,

---

[1] The plaintiffs consist of multiple parties. We refer to them collectively as "Hooks." Specifically, the parties are Charles G. Hooks III, acting individually and as independent executor of the estate of Charles G. Hooks, Jr., as Trustee of the Scott Ira McKeever Trust and the David Wayne McKeever Trust, and on behalf of Chas. G. Hooks & Son, a General Partnership; McKeever Partnership, Ltd.; and Charles G. Hooks III and Sue Ann Hooks, as co-trustees under the will of Charles G. Hooks, Sr.

[2] Hooks joined a preexisting lawsuit brought by various lessors against Samson. Hooks' suit was later severed from the other claims.

2

in 1999. Two leases were in Hardin County, Texas (the "Hardin County Leases"), and one was in Jefferson County, Texas (the "Jefferson County Lease").

This appeal from a final judgment involves seven claims raised by Hooks. First, Hooks alleges that Samson fraudulently induced Hooks to amend the Jefferson County Lease to allow for pooling. Second, Hooks asserts that Samson breached the most-favored-nations clause in all three leases, failing to pay Hooks the same higher royalty that it paid to a nearby lessor. Third, Hooks contends that Samson breached the formation-production clause in each lease by calculating gas royalties based on proceeds instead of the volume of gas leaving the reservoir. Fourth, Hooks claims that Samson wrongly "unpooled" a unit into which the two Hardin County Leases were pooled, and seeks damages for royalties allegedly owed from this unit. Fifth, Hooks alleges that Samson breached certain offset provisions in the two Hardin County Leases. Sixth, pursuant to a pretrial stipulation, Hooks contends that Samson must reimburse Hooks for attorney's fees. And seventh, Hooks asserts that the proper post-judgment interest rate is 18%, rather than 5% as decided by the court of appeals.

Hooks prevailed on the majority of his claims in the trial court. The trial court granted summary judgment for Hooks on the most-favored-nations clause claims and "unpooling" claims, but granted summary judgment for Samson regarding Hooks' allegations that Samson breached the offset provisions of the Hardin County Leases. The jury returned a verdict for Hooks on the fraud and formation-production claims. The trial court's final judgment awarded Hooks more than $21 million in damages, ordered Samson to pay the stipulated attorney's fees, and applied a post-judgment interest rate of 18%. The court of appeals, however, reversed, holding that Hooks take

3

nothing except for $52,257.22, a stipulated amount to reimburse Hooks for payment of ad valorem taxes. *Id.* at 440–41.

## II. Fraud and Limitations

Hooks' fraud claims relate to the Jefferson County Lease. This lease, which prohibited pooling, contained "offset obligations" providing that if a gas well were completed within 1,320 feet of Hooks' lease line but was not unitized with Hooks' acreage, then Samson would either drill an offset well, pay Hooks compensatory royalties, or release the offset acreage. In 2000, Samson drilled a well that bottomed about 1,186 feet from Hooks' lease, within the 1,320-foot protected zone. But, instead of complying with the original offset obligations, Samson asked Hooks to amend the Jefferson County Lease in 2001 to pool into a unit associated with the new well. In connection with this request, Samson provided Hooks with a plat that incorrectly placed the well's bottom hole outside of the protected zone. A plat with the same false information had already been filed with the Railroad Commission. Older Railroad Commission records, however, contained a directional survey and an attached plat[3] that correctly placed the bottom hole within the 1,320-foot boundary.[4] Other preliminary Railroad Commission filings demonstrated that Samson originally intended the well to bottom within 1,320 feet of Hooks' lease.

---

[3] The parties dispute whether, based on the record in this case, the plat was attached to the directional survey in the Railroad Commission filing. This does not affect our holding, and we assume without deciding that it was attached.

[4] Although the plat correctly placed the bottom hole within the protected zone, some data on the plat does not completely correspond to data on a later correct plat.

4

Hooks brought his fraud claims in 2007, alleging that Samson deprived Hooks of compensatory royalties by misrepresenting the well's bottom-hole location and fraudulently inducing Hooks to amend the lease and pool. A jury found that Samson committed fraud and statutory fraud, awarding more than $20 million in damages on these claims, and the trial court rendered judgment on the jury's verdict. The court of appeals, however, reversed, holding that the four-year statute of limitations for fraud barred the claims. *Id.* at 428–29 (citing TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4)).

Hooks argues that the court of appeals erred because the statute of limitations did not begin to run until Hooks "knew or should have known of facts that in the exercise of reasonable diligence would have led to the discovery of the wrongful act." *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 216 (Tex. 2011) (quoting *Little v. Smith*, 943 S.W.2d 414, 420 (Tex. 1997)). The jury found that, in the exercise of reasonable diligence, Hooks should have discovered Samson's fraud by 2007. Samson responds that, as a matter of law, reasonable diligence would have discovered the true location of the well's bottom hole in 2000 or 2001. Samson points to this Court's decisions in *BP America Production Co. v. Marshall*, 342 S.W.3d 59 (Tex. 2011), and *Shell Oil Co. v. Ross*, 356 S.W.3d 924 (Tex. 2011), where reasonable diligence required sophisticated lessors to acquaint themselves with "readily accessible and publicly available information" from Railroad Commission records. *Ross*, 356 S.W.3d at 929; *see Marshall*, 342 S.W.3d at 68–69. According to Samson, the directional survey and its associated plat, as well as filings showing the original proposed location of the well's bottom hole, should have been discovered by the exercise of reasonable diligence by 2001 at the latest, meaning that Hooks' fraud claims are barred by limitations.

5

We have long held that "fraud prevents the running of the statute of limitations until it is discovered, or by the exercise of reasonable diligence might have been discovered." *Ruebeck v. Hunt*, 176 S.W.2d 738, 739 (Tex. 1943).[5]  Generally, "[c]auses of action accrue and statutes of limitation begin to run when facts come into existence that authorize a claimant to seek a judicial remedy," *Emerald Oil*, 348 S.W.3d at 202, but "a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run," *S.V. v. R.V.*, 933 S.W.2d 1, 6 (Tex. 1996).  Because "fraud vitiates whatever it touches," *Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex. 1983), limitations does not start to run until the fraud is discovered or the exercise of reasonable diligence would discover it, *Marshall*, 342 S.W.3d at 69.

The same rule applies to claims of fraudulent inducement.  Fraudulent inducement is a subspecies of fraud; "with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties." *Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex. 2001).  Accordingly, the same principle applies: limitations does not start to run until the fraud with respect to the contract is discovered or the exercise of reasonable diligence would discover it.

---

[5] *See also Emerald Oil*, 348 S.W.3d at 216; *Marshall*, 342 S.W.3d at 68; *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996); *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988).

And just when would reasonable diligence discover the wrong?[6] And who decides? Although "the date a cause of action accrues is normally a question of law," *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 623 (Tex. 2011) (per curiam), reasonable diligence is an issue of fact, *Estate of Stonecipher v. Estate of Butts*, 591 S.W.2d 806, 809 (Tex. 1979).[7] Nevertheless, in some circumstances, we can still determine as a matter of law that reasonable diligence would have uncovered the wrong.[8] A survey of our decisions reveals the reasons for holding, as a matter of law,

---

[6] Hooks and amicus Cardwell, Hart & Bennett, LLP cite cases stating that if there is a fraudulent misrepresentation, it is no defense that proper inquiry might have revealed the truth. *See, e.g.*, *Buchanan v. Burnett*, 119 S.W. 1141, 1142 (Tex. 1909); *Labbe v. Corbett*, 6 S.W. 808, 811 (Tex. 1888); *Mitchell v. Zimmerman*, 4 Tex. 75, 79–80 (1849). These cases, however, stand for the general proposition that one may be liable for fraud even if it could be discovered by due diligence; they do not hold that limitations is extended even if due diligence would reveal the fraud. Also, at least one amicus, Cardwell, Hart & Bennett, LLP, invokes a lessee's implied covenant to act as a reasonably prudent operator. But we held in *HECI Exploration Co. v. Neel* that "[i]mplied covenants do not dispense with the need for royalty owners to exercise due diligence in enforcing their contractual rights, express or implied, within the statutory limitations period." 982 S.W.2d 881, 887 (Tex. 1998).

[7] *See also Shah v. Moss*, 67 S.W.3d 836, 846 (Tex. 2001) ("To avoid summary judgment on limitations grounds, Moss must have raised a fact issue to support his fraudulent-concealment assertion."); *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex. 1987) ("[W]e agree that whether the plaintiffs knew or should have known of the fraud . . . raises a fact issue . . . ."); *Borderlon*, 661 S.W.2d at 909 ("A fact issue exists whether, in the exercise of reasonable diligence, Borderlon knew, or should have known . . . , that the presence of the foreign object in her abdomen gave rise to a cause of action against Dr. Peck."); *Cherry v. Victoria Equip. & Supply, Inc.*, 645 S.W.2d 781, 782 (Tex. 1983) ("The ultimate duty to weigh the evidence, determine credibility and decide if fraudulent concealment actually existed rests upon the trier of fact."); *Ruebeck*, 176 S.W.2d at 740 ("What will constitute reasonable diligence to discover fraud and when the fraud might have been discovered by the exercise of such diligence are necessarily questions which must be determined from all the facts and circumstances in evidence in each particular case. When, under the facts in evidence, reasonable minds might differ on such issues, the findings of the jury thereon are binding on the appellate court.").

[8] *See, e.g.*, *Etan Indus.*, 359 S.W.3d at 623 ("On these facts, we hold as a matter of law that the estoppel effect of the alleged fraudulent concealment ended in December 2002 at the latest. By that date, the Lehmanns were apprised of facts, conditions, and circumstances sufficient to cause a reasonable person to make inquiry that would lead to the discovery of the concealed cause of action."); *Ross*, 356 S.W.3d at 929 ("Because the Rosses could have discovered Shell's alleged fraud through the use of reasonable diligence, we hold that, as a matter of law, the doctrine of fraudulent concealment cannot apply to toll the statute of limitations."); *Marshall*, 342 S.W.3d at 69 ("[A]s a matter of law, the Marshalls would have been able to discover BP's fraud through the use of reasonable diligence."); *Kerlin v. Sauceda*, 263 S.W.3d 920, 926 (Tex. 2008) ("As a matter of law, the Ballis could have discovered the existence of any claims before limitations expired through the exercise of reasonable diligence.").

7

that the exercise of reasonable diligence would lead to the discovery of the wrong within the statutory period.[9]

In *Shell Oil Co. v. Ross*, we considered untimely claims made by Ross—an attorney who "understood the oil and gas industry"—and his family that Shell had underpaid gas royalties. 356 S.W.3d at 926. Despite Shell's allegedly fraudulent representations, the Rosses had a duty to "make themselves aware of relevant information available in the public record." *Id.* at 928. We held that "[d]iligence is required when claimants have been 'put on notice of the alleged harm of injury-causing actions.'" *Id.* (quoting *Emerald Oil*, 348 S.W.3d at 207).[10] Discrepancies in royalties paid to the Rosses on different wells put them on notice. *Id.* at 929. A publicly available price index illuminated the underpayments, as did General Land Office records demonstrating that Shell paid higher royalties to the State even though it owed the Rosses the same royalty. *Id.* Had the Rosses exercised reasonable diligence, this "[r]eadily accessible and publicly available information" would have revealed the underpayments. *Id.* Accordingly, as a matter of law, they did not exercise reasonable diligence.

In *BP America Production Co. v. Marshall*, we held that the statute of limitations was not tolled when BP fraudulently represented that it was maintaining continuous operations on a lease.

_____

[9] Hooks denies relying on the discovery rule or fraudulent concealment. Although fraudulent concealment allows the statute of limitations to be tolled for causes of action besides fraud itself, the standard of reasonable diligence remains the same: "Fraudulent concealment only tolls the running of limitations until the fraud is discovered or could have been discovered with reasonable diligence." *Marshall*, 342 S.W.3d at 67. Consequently, cases discussing fraudulent concealment are relevant to the meaning of reasonable diligence.

[10] Samson and Hooks dispute whether parties must be put on notice of potential harm before they have a duty to exercise reasonable diligence, as well as whether Hooks was on notice. We need not reach these questions here. Instead, we decide the case by assuming, without deciding, that Hooks should exercise reasonable diligence.

342 S.W.3d at 67–69. This case also involved a sophisticated plaintiff who "understood the oil and gas industry." *Id.* at 69. The public record contained two public filings with the Railroad Commission: a well log and a plugging report that contained "highly technical information." *Id.* at 66. Had the Marshalls read these two documents together, they would have discovered that BP was not conducting good-faith continuous operations. *Id.* at 69. "[A]s a matter of law, the Marshalls would have been able to discover BP's fraud th[r]ough the use of reasonable diligence." *Id.*

We have reached similar conclusions in other cases. For example, if the plaintiff has "actual knowledge . . . of injury-causing conduct," then this "starts the clock on the limitations period" "[i]rrespective of the potential effect of fraudulent concealment." *Emerald Oil*, 348 S.W.3d at 209. The availability of court records may indicate under some circumstances that reasonable diligence would have found the information. *See Kerlin*, 263 S.W.3d at 926. Land title records and probate proceedings create constructive notice, "an irrebuttable presumption of actual notice," which prevents limitations from being delayed. *Mooney v. Harlin*, 622 S.W.2d 83, 85 (Tex. 1981); *Sherman v. Sipper*, 152 S.W.2d 319, 321 (Tex. 1941). These cases reveal that when there is actual or constructive notice, or when information is "readily accessible and publicly available," *Ross*, 356 S.W.3d at 929, then, as a matter of law, the accrual of a fraud claim is not delayed.

The present case does not fall into any of the categories where we can determine, as a matter of law, that reasonable diligence would have timely uncovered the fraud. Though Samson relies extensively on *Marshall* and *Ross*, Hooks correctly identifies an important distinction: in those cases, the public record itself was not tainted by the fraud. We have not previously considered whether

9

reasonable diligence would uncover a correct public Railroad Commission filing when more recent filings contain false information.

In December 2000, Samson submitted a plat to the Railroad Commission as part of an application to pool. The plat was signed by Glenn Lanoue, Samson's landman, and dated November 16, 2000, certifying that it was "a true and correct plat based on the best of my knowledge." The plat had a label stating "Proposed Well Location," but, unlike some earlier plats in the record, the individual data on this plat were not themselves also marked as "proposed." The plat gave "X" and "Y" coordinates for the well's bottom-hole location, the distance of the well from various survey lines, and the well's surface location along with the bottom hole's location relative to the surface. Trial testimony established that this data is internally consistent, placing the well's bottom hole more than 1,320 feet from Hooks' lease line even though the well actually bottomed within the 1,320-foot protected zone. When Lanoue was asked where he obtained the bottom hole's distance from the survey lines, he testified that he created them himself.[11]

Samson later provided a plat with the same information to Hooks in connection with Samson's request to amend the lease and allow pooling. Samson argues the plat was ambiguous and indefinite, creating a need for Hooks, an experienced oil and gas lessor, to investigate further. On the plat is the notation "1400' ± scaled," but trial testimony presented different interpretations of what points this distance measured between. Elsewhere, the plat expressly states that the bottom-hole location is "1400' ± scaled' FEL Unit." Testimony indicated that "FEL" means "from the

_____

[11] His deposition testimony was: "I got them from myself."

10

eastern line" of the pooled unit. Another testified that taking the notation literally would be unreasonable because if the well truly bottomed about 1,400 feet from the eastern line of the unit, as opposed to Hooks' lease line, it would be very close to Hooks' lease, perhaps even within it.

Months earlier, a directional survey performed by an independent surveyor and an accompanying plat were filed with the Railroad Commission. Some information on the directional survey clearly contradicts the Lanoue plat discussed above, and Samson urges that the information on the survey could have easily been used to estimate the bottom hole's true location. Hooks argues that it would take an expert to interpret the survey and pinpoint its location.

We cannot say that, as a matter of law, Hooks should have discovered the accurate information when the more recent filing falsely conveyed that the well had been completed outside the protected zone. Although reasonable diligence should examine readily available information in the public record, it may stop at more recent filings with the Railroad Commission, without needing to double-check more recent filings against earlier filings. This accords with our prior decisions. We have held that "fraud vitiates whatever it touches," *Borderlon*, 661 S.W.2d at 909, in this case, the public record. We have held that not all Railroad Commission records create constructive notice, *HECI Exploration Co.*, 982 S.W.2d at 886, meaning that, in some circumstances, Railroad Commission filings may exist that one is not charged with discovering. We have held that fraudulent concealment is "an equitable doctrine that . . . is fact-specific." *Marshall*, 342 S.W.3d at 67. And we have held that "a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run." *S.V.*, 933 S.W.2d at 6. Though reasonable diligence should lead to information in the public record, here, the fraudulent information itself taints

11

the public record. To require, as a matter of law, that Hooks double-check the more recent filings against earlier filings is a higher burden than reasonable diligence requires.

Samson argues that the directional survey is the "gold standard," and that the fraudulent plat was filed to show unit lines for pooling purposes, not to provide the exact location of the well's bottom hole. Samson observes that, in some situations, Texas law mandates directional surveys performed by independent surveyors, *see* 16 TEX. ADMIN. CODE §§ 3.11(c)(2)(A); 3.12 (Tex. R.R. Comm'n), and asserts that Hooks should have known this and looked for the survey to establish the bottom hole's true location. Samson also argues that because Lanoue told Hooks the well was about 1,500 feet from the lease line, but then sent Hooks a plat indicating the bottom hole was about 1,400 feet away, very close to the protected zone, these inconsistencies should have caused Hooks to inquire further. None of these arguments avail. Had Hooks gone to the Railroad Commission, the more recent filing would have been a plat with the same inaccurate information, placing the well's bottom hole beyond the protected zone. Hooks is not required, as a matter of law, to double-check it against the earlier directional survey. To the extent some information on the Lanoue plat is unclear, a careful reader could have examined other information on the plat (e.g., the "X" and "Y" coordinates, distances from lease lines, and location of the bottom hole relative to the surface) to resolve any ambiguity, determining that the plat placed the bottom hole outside the protected zone. Indeed, Hooks presented testimony that this plat clearly placed the bottom hole outside of the protected zone. Thus, though Samson's arguments regarding potential ambiguities on the plat, and the availability and superiority of the directional survey, may be appropriate for the factfinder to

12

consider when determining whether reasonable diligence would have uncovered the fraud, they do not establish that, as a matter of law, Hooks did not exercise reasonable diligence.

Amicus Texas Oil and Gas Association suggests that holding for Hooks will encourage litigants to guise their breach-of-contract claims as fraud claims to avoid the statute of limitations. We disagree. To establish fraudulent inducement, "the elements of fraud must be established as they relate to an agreement between the parties." *Haase*, 62 S.W.3d at 798–99. Many breach-of-contract cases do not implicate the elements of fraud. Only when fraud is established with regard to the contract may fraudulent inducement be established, and, in any case, the suit is based on the fraud itself rather than a breach of contract. Moreover, because fraudulent concealment may toll the statute of limitations for contract claims, no incentive will exist to recast them as fraud claims.

We hold that when the defendant's fraudulent misrepresentations extend to the Railroad Commission record itself, earlier inconsistent filings cannot be used to establish, as a matter of law, that reasonable diligence was not exercised. Under these circumstances, reasonable diligence remains a fact question. The factfinder, no doubt, may consider the failure to examine older records when determining whether reasonable diligence was exercised, but their availability is not enough to establish that reasonable diligence was not exercised as a matter of law.

Because the court of appeals mistakenly concluded that the date by which Hooks reasonably should have discovered Samson's fraud was a question of law, it did not reach Samson's other arguments concerning Hooks' fraudulent inducement claims. *See* 389 S.W.3d at 428–30. These include the factual and legal sufficiency of the evidence with regard to common-law fraud, statutory fraud, and damages for fraud, as well as the factual sufficiency of the evidence regarding when

13

Hooks, by the exercise of reasonable diligence, would have discovered the fraud. We remand these issues for the court of appeals' consideration.

### III. Breach of Most-Favored-Nations Clause Claims

When an oil and gas lease contains a most-favored-nations clause, it typically provides that a lessee who pays higher royalties on nearby leases must pay matching royalties to the lessor under the subject lease. Here, all three leases contain an identical most-favored-nations clause, providing that

> If Lessee shall enter into an oil and gas lease(s) part of which is located within three (3) miles of any exterior boundary of the subject lands covered by the subject Lease, hereinafter referred to as "Third Party Lease", Lessee shall notify Lessor of such fact. If the reserved royalty or the amount per acre payable for delay rentals, shut-in rentals or minimum royalty, at any time payable under such Third Party Lease, is higher than the like royalty and amounts payable as provided in the subject Lease, the royalty or amount payable per acre in the subject lease, which is less than that provided in the Third Party Lease shall be immediately increased so that it will equal the royalty or other amounts payable under the Third Party Lease. The subject Lease and the Third Party Lease must be calculated in substantially the same manner, such that the comparison of the subject Lease and the Third Party Lease is based on the same effective net royalty or other payments, and that same shall include or deduct the same types of charges, taxes and other burdens from such interests.

The trial court determined on summary judgment that Samson breached the clause by paying a higher royalty to the State of Texas.

Samson leased a qualifying oil and gas interest from the State at the same 25% royalty Samson paid Hooks. In 2003, to induce the State to consent to a Pooling Agreement, Samson increased the State's royalty. This Pooling Agreement allocates production among different interest owners based on their individual shares in their own tracts and the proportion that their tracts play in the overall unit. This general allocation is made "provided that the state[']s unit royalty interest

14

shall be 0.7969%." Considering the size of the State's tract relative to the size of the entire unit, this is equivalent to a royalty of 28.28896% on the production allocated to the State's tract. In other words, the State's royalty of 0.7969% on production from the *unit* equates to a 28.28896% royalty on production allocated to the State's *tract*.

Samson argues that the most-favored-nations clause does not apply because the clause regards the "reserved royalty . . . payable under" another lease, whereas Samson paid the State higher royalties under the Pooling Agreement. If the clause were to apply to more than just leases, then it would have said so, Samson argues. Samson also asserts that the Pooling Agreement increased the State's allocation of production from the unit without raising the royalty.

We disagree. To resolve this dispute, we apply the "'primary legal consequence' of pooling to this case—that production anywhere on a pooled unit is treated as production on every tract in the unit." *See Key Operating & Equip., Inc. v. Hegar*, 435 S.W.3d 794, 798–99 (Tex. 2014) (quoting *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 170 (Tex. 1999)). The reason a lessor receives royalties under a pooling agreement, even if no production occurs directly on that lessor's tract, is because production elsewhere on the pooled unit is attributed to the lessor's tract. And the reason the lessor receives royalties on production attributed to the lessor's tract is because of the underlying lease. It follows that a lessor's royalty on production from the unit as a whole reflects the lessor's royalty on production from its individual tracts in proportion to the size of the tracts relative to the overall unit. This accords with the nature of pooling, which "effects a cross-conveyance among the owners of minerals under the various tracts of royalty or minerals in a pool so that they all own undivided interests under the unitized tract in the proportion their contribution bears to the unitized

15

tract." *Montgomery v. Rittersbacher*, 424 S.W.2d 210, 213 (Tex. 1968). In other words, the royalty owed on production from the whole unit is necessarily tied to the royalty owed on production from the lessor's individual tracts. To increase one is to increase the other.

Thus, by definition, Samson's grant of a royalty to the State of 0.7969% on production from the unit means that Samson increased the State's 25% royalty on production from its tract to 28.28896%. For purposes of the most-favored-nations clause, the royalty imposed by the Pooling Agreement is "payable under" the lease, and the Pooling Agreement itself states that it was entered into by the State "as Lessor" and Samson "as Lessee."

The court of appeals here defined a most-favored-nations clause as "a vendor protection clause" that "enables the vendor to receive the benefit of increases in the *market price* of his product over the term of a long range contract with a purchaser." 389 S.W.3d at 435 (quoting *Lone Star Gas Co. v. Howard Corp.*, 556 S.W.2d 372, 374 (Tex. Civ. App.—Texarkana 1977), *writ ref'd n.r.e.*, 568 S.W.2d 129 (Tex. 1978) (per curiam)) (emphasis added). Though this may be the purpose of such clauses, unless they expressly so provide, we are not authorized to examine whether increased prices were caused by market forces or, as seems to be the case here, other considerations. The reason for giving the State a higher royalty—inducing it to pool—is irrelevant in determining whether the most-favored-nations clause applies.

For all these reasons, we conclude that the court of appeals erred in holding that Samson did not breach the most-favored-nations clause.

16

## IV. Breach of Formation-Production Clause Claims

Article III of each lease specifies a 25% royalty on "gas, including casinghead gas or other gaseous substances produced from said land," as well as a 25% royalty on "all other liquid hydrocarbons that may be produced from said land." At the end of Article III, each lease also states that

> For the purposes of calculating all royalties payable under Article III. herein, it is expressly provided that all such calculations shall be based on formation production as reported on Texas Railroad Commission forms P-1 and P-2.

Hooks claims that Samson has paid gas royalties on proceeds from gas sales rather than on the total amount of formation production. Samson disputes Hooks' interpretation of the formation-production clause. The trial court awarded damages for breach of the clause, but the court of appeals reversed. 389 S.W.3d at 437.

"In construing contracts, we must ascertain and give effect to the parties' intentions as expressed in the document." *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). We attempt to harmonize all contractual provisions by "analyzing the provisions with reference to the whole agreement." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam). We "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served," and, when possible and proper, we avoid a "construction which is unreasonable, inequitable, and oppressive." *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987). If, through the use of relevant rules of construction, the contract can be given a definite meaning, we construe it as a matter of law. *Frost Nat'l Bank*, 165 S.W.3d at 312.

The parties do not dispute the meaning of formation production; rather, they dispute what it means to calculate all royalties based on formation production. As used on the old Railroad Commission forms P-1 and P-2,[12] formation production describes the total volume of gas removed from the underground reservoir. Not all gas, however, that leaves the reservoir as gas continues to be a gas at the surface; instead, some condenses. "Condensate is hydrocarbons that exist in the form of gas when contained in the natural gas reservoir underground, which condense into a liquid form when released from the reservoir's higher pressure and temperature." *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 704 n.7 (Tex. 2008). When reporting the total volume of gas removed from the reservoir to the Railroad Commission, Samson would convert the volume of condensate at the surface to its equivalent volume as a gas.

Hooks argues that because all royalties must be based on formation production, and formation production is the volume of all production while it existed in the reservoir as gas, then the 25% royalty paid on gas should be for the volume of gas removed from the reservoir instead of the volume of gas at the surface. Notably, however, Hooks contends that Samson must still pay a 25% royalty on the volume of condensate taken from the wellhead. In other words, Hooks asserts that the formation-production clause requires that a 25% royalty be paid on the liquid condensate, which must then be converted to its equivalent in gas volume so that another 25% royalty may be paid on

---

[12] These forms, referred to by the leases, are no longer used by the Railroad Commission. Instead, Form PR has replaced them. According to the instructions accompanying Form PR, "[f]or gas well gas, you no longer need to convert the condensate production to a gas equivalent volume; the RRC will automatically convert the volume." TEX. R.R. COMM'N, INSTRUCTIONS FORM PR: MONTHLY PRODUCTION REPORT, *available at* http://www.rrc.texas.gov/media/2646/formpr-instructions-final-02-2005.pdf. This opinion need not—and does not—interpret "formation production" as used by the new form.

18

it again. Samson responds that Hooks' interpretation unreasonably imposes a double royalty by requiring Samson to pay royalties on condensate twice: first as condensate, and then again as a gas as part of formation production. Samson submits that the formation-production clause means Samson must pay for produced minerals, either as gas or as condensate, but not that Samson must pay royalties on condensate twice.

The formation-production clause provides that *all* royalty calculations be based on formation production. Hooks' approach, however, causes only gas royalties (for gas as gas and for condensate as gas) to be based on formation production. For royalties on condensate as condensate, Hooks' approach bases them solely on the amount of condensate without reference to formation production. We disagree with that interpretation.

The formation-production clause simply requires Samson to convert the volume of condensate to its equivalent volume in gas, ensuring that the total volume that Samson pays royalties on relates to the volume that Samson reports to the Railroad Commission. The conversion ensures that Samson pays royalties on an appropriate volume of production, not that Samson pays royalties on some production twice. In other words, the clause does not require that royalties be paid on everything as gas. Otherwise, the instruction that all royalties be based on formation production would be ignored, because royalties would be paid on condensate without reference to formation production. This interpretation of the clause, unlike Hooks', allows royalties on condensate (as well as on gas) to be based on formation production, as the leases require.

Hooks also argues that Samson failed to pay royalties on gas that was not ultimately sold, such as lost or consumed gas. Hooks points to the testimony of a Samson employee that Samson

19

pays royalties based on dollars received rather than on formation production. But Hooks presented no evidence of the royalties that should have been paid on the unsold gas; Hooks merely aggregates this amount (if any) with the royalties that Hooks claims are owed on condensate when converted back to gas. Absent specific evidence of damages for lost and used gas—as opposed to a combined amount for lost and used gas and condensate as part of formation production—Hooks cannot prevail, and thus we need not determine whether Samson breached the contract by failing to pay royalties on lost and used gas. In sum, we agree with the court of appeals' decision with regard to the formation-production claims.

### V. "Unpooling" Claims

The two Hardin County Leases authorized Samson to pool. Samson pooled both of Hooks' Hardin County Leases into the "Blackstone Minerals 'A' No. 1" unit, effective as of the date of first production in June 2001. Because the owner of 87.5% of the mineral interest in the tract where the well in this unit was located refused to pool, Samson decided to "amend" the unit designation. A letter from Samson dated October 24, 2001, notified Hooks of an "Amendment and Name Change of Black Stone Minerals 'A' No. 1 Unit Designation, Hardin County, Texas":

> Reference is made to Samson Lone Star Limited Partnership's letter dated March 20, 2001, in which approval to pool on 640-acre plus 10% tolerance was received. Please note that the Unit Designation for the Black Stone Minerals "A" No. 1 is being amended and will now be called the Joyce Du Jay No. 1 Unit.
>
> No additional action is needed on your part, this letter is meant for informational purposes only. Please update your records with the new name and call the undersigned should you have any questions.

The amended unit was effective in January 2002, when production began.

As filed in the Hardin County records, the amendment did not merely change the name of the existing unit but also significantly altered its boundaries. Whereas the original unit extended from a depth of 6,000 feet to a depth of 13,800 feet, the new Joyce Du Jay No. 1 Unit, beginning at 12,400 feet below surface, extends down without limit. Samson has paid Hooks royalties on production from the Joyce Du Jay No. 1 Unit, but not from the original Blackstone Minerals A-1 Unit. Accordingly, Hooks seeks royalties on the original unit, claiming that Samson did not have the authority to "unpool" the Blackstone Minerals A-1 Unit. The trial court agreed, granting summary judgment in Hooks' favor. Samson responds—and the court of appeals held—that Hooks ratified the new unit by accepting royalties on it, and therefore cannot recover from the old unit. 389 S.W.3d at 434. Samson also asserts that if Hooks is entitled to royalties from the original unit, then these should be offset by the royalties Hooks has already received on the Joyce Du Jay No. 1 Unit.

Notably, Hooks does not question the validity of the Joyce Du Jay No. 1 Unit; rather, Hooks alleges that he should receive royalties from both the original unit and the Joyce Du Jay No. 1 Unit. Hooks notes that the Hardin County Leases allowed unlimited pooling. Although Samson claimed it was "amending" the original unit, Hooks suggests that the change effectively added another unit without eliminating the original one.

Factually, Hooks' position is problematic. Samson's letter to Hooks made clear that it purported to "amend" the unit designation, not merely create an additional unit. The letter stated that it concerned an "amendment *and* name change," (emphasis added), so Hooks should have been aware that the pooled area could change. The original designation and the amended designation, as well as their differences, were a matter of public record. Though Hooks did not know exactly how

21

Samson amended the unit designation, Hooks was nevertheless aware that Samson amended it, and Hooks regularly accepted royalty checks for the Joyce Du Jay No. 1 Unit without ever receiving royalties on the earlier designation. Under these circumstances, Hooks cannot claim additional royalties from the older unit because Hooks ratified the amendment, having full knowledge that something had changed and by his actions consenting to it, failing even to challenge the new unit. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 677 (Tex. 2000). Because Hooks does not deny the validity of the new unit, one that existed only after Hooks was notified that the old unit was being amended, Hooks cannot later assert that he should also receive royalties from the old unit. *See Ohrt v. Union Gas Corp.*, 398 S.W.3d 315, 329 (Tex. App.—Corpus Christi 2012, pet. denied) ("Prolonged silence or inaction in not asserting a known right is conduct that may amount to waiver."); *see also Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 195 (Tex. App.—Dallas 2013, no pet.) ("Any act inconsistent with an intent to avoid a contract has the effect of ratifying the contract."). Because of the undisputed contents of the notice letter, Hooks' acceptance of royalties for the new unit, and Hooks' refusal to challenge the new unit, we decide the question of ratification as a matter of law.[13]

We base our holding solely on the facts that Hooks received notice of an amendment to the unit designation, accepted royalties from the amended unit, and does not challenge the amended unit. We need not decide other issues raised by the parties, such as whether Samson had authority to

---

[13] *See, e.g.*, *Thomson Oil Royalty, LLC v. Graham*, 351 S.W.3d 162, 166 (Tex. App.—Tyler 2011, no pet.); *Barker v. Roelke*, 105 S.W.3d 75, 85 (Tex. App.—Eastland 2003, pet. denied); *Old Republic Ins. Co. v. Fuller*, 919 S.W.2d 726, 728 (Tex. App.—Texarkana 1996, writ denied).

amend the unit or whether pooled units may overlap. *See* 389 S.W.3d at 431–33. We affirm the judgment of the court of appeals with regard to Hooks' "unpooling" claims.

## VI. Breach of Hardin County Offset Provision Claims

Like the Jefferson County Lease, the two Hardin County Leases also contain offset provisions requiring that if a well is completed within 1,320 feet of Hooks' lease line but is not unitized with Hooks' acreage, then within ninety days of production from the infringing well, Samson must either drill an offset well, pay Hooks compensatory royalties, or release the offset acreage. Under these offset provisions, if Samson elects to pay compensatory royalties, then it has a recurring monthly obligation to pay them. The first compensatory royalty would be due "following the expiration of ninety (90) days after the end of said calendar month in which production [is] first marketed."

The Hardin County Leases allow pooling and also contain what the parties have termed an "entire-acreage clause":

> Operations for drilling on or production of gas from any part of the pooled unit which includes all or a portion of the Leased Premises . . . shall be considered as operations for drilling on or production of gas from the Leased Premises, . . . and the entire acreage constituting such unit or units shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if the same were included in this Lease.

Samson pooled the Hardin County Leases and drilled additional gas wells within 1,320 feet of the pooled units but more than 1,320 feet from Hooks' individual tracts. Hooks argues that the entire-acreage clause extended the 1,320-foot protected zone around the units themselves, and that Samson breached by disregarding the offset provisions. In the trial court, Samson moved for

23

summary judgment on this claim on several grounds, including limitations, which the trial court granted. The court of appeals affirmed because of limitations. 389 S.W.3d at 440.

Before analyzing the issue of limitations, we first consider Samson's argument that Hooks waived his claims for breach of the offset provisions by filing a proposed judgment with the trial court. In Hooks' motion for judgment, he averred that he moved for judgment "without waiving any rights to contest or appeal prior orders of the Court." And, the statement "APPROVED AS TO FORM" was above Hooks' attorney's signature on the proposed judgment. Samson asserts that these reservations did not preserve Hooks' right to appeal, invoking *Litton Industrial Products, Inc. v. Gammage*, where we "disapprove[d] a practice by which a party, by motion, induces the trial court on the one hand to render a judgment, but reserves in a brief the right for the movant to attack the judgment if the court grants the motion." 668 S.W.2d 319, 322 (Tex. 1984). Importantly, *Litton Industrial Products* applies only to arguments inconsistent with the specifics of the requested judgment. *See id.*

In contrast, when the argument asserted on appeal is not inconsistent with the judgment, the argument is not waived. *See Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005). This is because "[t]here must be a method by which a party who desires to initiate the appellate process may move the trial court to render judgment without being bound by its terms." *First Nat'l Bank v. Fojtik*, 775 S.W.2d 632, 633 (Tex. 1989) (per curiam). Here, Hooks specifically reserved the right to challenge prior orders of the court, and by moving for judgment on the claims that Hooks won, Hooks did not waive his right to appeal on claims that he lost.

24

Regarding limitations, Samson argues, and the court of appeals held, that the four-year statute of limitations bars Hooks' claims for breach of the offset provisions because the offset provisions were first breached in 2001, at least five years before Hooks filed suit. 389 S.W.3d at 440; *see* TEX. CIV. PRAC. & REM. CODE § 16.004. Hooks responds that compensatory damages under the offset provisions are owed monthly, Samson's breach is recurring, and Hooks can recover damages for royalties that should have been paid during the four years preceding the filing of suit. *See, e.g.*, *Lyle v. Jane Guinn Revocable Trust*, 365 S.W.3d 341, 355 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Samson denies that the breach, if any, has been recurring. Specifically, Samson argues that the offset provisions authorized Samson to elect to release the offset acreage or drill an offset well or pay compensatory royalties. Samson contends that it is not bound by the recurring provision when it could have opted for a non-recurring one, and damages for breach of a non-recurring provision are barred by limitations.

It is true that, "if the terms of an agreement call for periodic payments during the course of the contract, a cause of action for such payments may arise at the end of each period." *Intermedics, Inc. v. Grady*, 683 S.W.2d 842, 845 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).[14] The question remains whether, because the contract gave Samson alternatives that were not recurring, Samson may prevent Hooks from suing based on the one recurring obligation. Samson cites a Fifth Circuit case holding that when a party refuses to make an election under an alternative contract, the

---

[14] *See, e.g.*, *Barnes v. LPP Mortg., Ltd.*, 358 S.W.3d 301, 307 (Tex. App.—Dallas 2011, pet. denied); *Lyle*, 365 S.W.3d at 355; *Headington Oil Co., L.P. v. White*, 287 S.W.3d 204, 214 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *F.D. Stella Prods. Co. v. Scott*, 875 S.W.2d 462, 465–66 (Tex. App.—Austin 1994, no writ); *Dvorken v. Lone Star Indus., Inc.*, 740 S.W.2d 565, 567 (Tex. App.—Fort Worth 1987, no writ).

choice does not devolve to the other party. *See Liberty Bank v. Talman Home Mortg. Corp.*, 877 F.2d 400, 407 (5th Cir. 1989). The Fifth Circuit held that when the "breaching party had the option of choosing between two alternatives at the time of breach, 'the measure of damages is the loss caused by reason of the promisor failing to perform the promise with the lesser value.'" *Id.* (quoting *Stewart v. Cran-Vela Rental Co.*, 510 F.2d 982, 986 (5th Cir. 1975)). Although Samson has not presented evidence of alternative measures of damages, it presumably argues that limitations reduces the alternative damages to zero. Hooks responds by citing a decision from 1849, *Hemming v. Zimmerschitte*, where this Court observed that there "does not appear on the record, as presented, a manifestation of willingness on the part of the obligor to discharge his obligation; and the right of election, if applicable at all, is lost and cannot avail the defendant." 4 Tex. 159, 164 (1849). We have not addressed the issue since then.

We need not reach the general issue of the measure of damages for breach of an alternative contract. The Hardin County Leases required Samson to begin drilling an offset well or release the acreage within ninety days of production from the infringing well. But Samson must pay compensatory royalties slightly later—"on or before the first day of the calendar month next following the expiration of ninety (90) days after the end of said calendar month in which production [is] first marketed." Assuming that Samson breached, then by waiting without performing the first two alternatives, Samson impliedly elected to perform the later one, the only choice remaining after the first ninety days had passed. If Samson breached the offset provisions, then Samson's failure to timely elect an alternative creates an implied election of the recurring compensatory royalty payments. Accordingly, if Samson did indeed breach, then Hooks is entitled to damages for royalties

26

owed within four years of filing suit. This accords with the nature of damages: providing "just compensation for the loss or damage actually sustained." *Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952). When the law would allow compensation under a recurring alternative (i.e., compensatory royalties) but not under a non-recurring alternative, it would not be just to allow the obligor's silent, continuous breach to constitute an election of the non-recurring alternative.

The court of appeals held for Samson on limitations and did not reach the merits of Hooks' claim for breach of the offset provisions and the proper construction of the entire-acreage clause. *See* 389 S.W.3d at 440. Because limitations does not apply to the compensatory royalties that may have been owed within the four years preceding suit, we remand for the court of appeals to consider the merits of Hooks' claims.

## VII. Attorney's Fees Claims

The parties stipulated that if Hooks "prevail[ed] on any of [his] claims" (with exceptions not applicable here), Samson would reimburse Hooks for a stipulated amount of attorney's fees. Because Hooks prevailed on several claims in the trial court, the trial court granted Hooks these attorney's fees. The court of appeals, however, held that Hooks take nothing except for $52,257.22, a stipulated amount to reimburse Hooks for ad valorem taxes that the leases required Samson to pay. *Id.* at 438. It also held that reimbursement for the ad valorem taxes did not constitute "prevail[ing] on [a] claim[]" as contemplated by the stipulation. *Id.* Accordingly, the court of appeals did not require Samson to pay attorney's fees. *Id.*

We need not decide whether the ad valorem taxes trigger Samson's obligation to pay attorney's fees under the stipulation. Rather, under our decision today, Hooks prevails on another

27

claim such that he is entitled to the stipulated amount of fees.[15]  We reverse the court of appeals on this point.

### VIII.  Interest Rate Claims

Hooks seeks, and the trial court granted, a post-judgment interest rate of 18%.  Each lease provides that "past due royalties . . . shall be subject to a Late Charge based on the amount due and calculated at the maximum rate allowed by law."  Because the court of appeals reversed all of Hooks' damages except for compensation for ad valorem taxes, it reduced the interest rate to 5%.  *Id.* at 439.

The Texas Finance Code provides for a maximum post-judgment interest rate of 18% on contract claims:

> A money judgment of a court of this state on a contract that provides for interest or time price differential earns post-judgment interest at a rate equal to the lesser of: (1) the rate specified in the contract, which may be a variable rate; or (2) 18 percent a year.

TEX. FIN. CODE § 304.002.  But, if the contract does not specify the interest rate, then the rate is determined under section 304.003 of the Finance Code.  Under section 304.003(c), the post-judgment interest rate is "the prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation," not to exceed 15% a year or fall below 5% a year.  *Id.* § 304.003(c).  "On the 15th day of each month, the consumer credit commissioner shall determine the post-judgment interest rate to be applied to a money judgment rendered during the succeeding calendar month."  *Id.* § 304.003(b).  Here, the trial court's final judgment was rendered in December

---

[15] At the least, Hooks prevails on his claims under the most-favored-nations clause.  Other claims, such as fraud and breach of the Hardin County offset provisions, are remanded to the court of appeals for further consideration.

2008, and the judgment interest rate according to the consumer credit commissioner was five percent.[16]

The leases only impose "the maximum [interest] rate allowed by law" for past-due royalties. Accordingly, to the extent Hooks recovers for past due royalties, he is entitled to an 18% interest rate. For other recoveries, the statutory rate of 5% applies because Hooks has not directed us to any portion of the leases providing otherwise. We affirm in part and reverse in part the court of appeals' judgment regarding post-judgment interest rates.

## IX.  Conclusion

In summary, we reverse the court of appeals regarding limitations for fraud, the most-favored-nations clause, limitations for breach of the offset provisions in the Hardin County Leases, and attorney's fees. We affirm in part and reverse in part regarding the applicable post-judgment interest rate. And we affirm regarding the formation-production and "unpooling" claims. We remand to the court of appeals for further action consistent with this opinion.

_____
John P. Devine
Justice

**OPINION DELIVERED:**  January 30, 2015

---

[16]  *See* OFFICE OF THE CONSUMER CREDIT COMM'R, JUDGMENT RATE SUMMARY, *available at* http://www.occc.state.tx.us/pages/int_rates/Judgment%20Rate%20Summaries/Thru%202014%20Judgment%20Rate%20Summary.pdf.

# Tab B

*National Property Holdings, LP v. Westergren,* No. 13-0801 (Tex. Jan. 9, 2015) (per curiam)

# IN THE SUPREME COURT OF TEXAS

No. 13-0801

NATIONAL PROPERTY HOLDINGS, L.P., MICHAEL PLANK
AND RUSSELL PLANK, PETITIONERS,

v.

GORDON WESTERGREN, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

**PER CURIAM**

This dispute involves a mediated settlement agreement, an oral side agreement, and a subsequent written release. A pivotal issue is whether Gordon Westergren released his claims for breach of the oral side agreement or whether, as he insists and the jury found, he was fraudulently induced into signing the release. On that issue, we conclude that Westergren's fraudulent inducement defense must fail as a matter of law because the record conclusively establishes that he had a reasonable opportunity to read the release before he signed it and elected not to do so. We also conclude that the oral side agreement did not satisfy the statute of frauds and that Westergren did not breach the mediated settlement agreement or the release by filing this suit. For these reasons, we reverse in part and affirm in part the court of appeals' judgment and reinstate in part the trial court's take-nothing judgment and award of costs.

The facts giving rise to the parties' claims relate to a 190-acre tract of land in La Porte, Texas. The parties hotly dispute the facts, but because we are reviewing the reversal of a judgment

notwithstanding a jury verdict in favor of Westergren, we "credit evidence favoring the jury verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009) (quoting *Cent. Ready Mix Concrete Co., Inc. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007)). The evidence favoring the jury verdict establishes that Westergren was the first to enter into an option contract to purchase the highly desired property. When he discovered that the owner had later entered into similar option contracts with two other interested buyers, he sued all three and filed a *lis pendens* against the property, preventing any further development or sale (the Haynsworth litigation). The three defendants appeared and filed counterclaims. Meanwhile, several developers, including National Property Holdings, L.P. (NPH), were also interested in acquiring the property but could not pursue it while the Haynsworth litigation remained pending. In an apparent attempt to overcome that obstacle, Russell Plank, who was NPH's consultant, contacted Westergren's attorney and offered to help pay Westergren's attorney's fees in the Haynsworth litigation. When asked why NPH would do that, Plank replied: "[because] we're going to be partners." Consistent with Plank's call, NPH and Plank each sent Westergren's attorney a $5,000 check.

When the lawsuit later went to mediation, Plank attended on behalf of NPH, although NPH was not a party to the suit. The mediation was successful: NPH agreed to purchase the property, and all defendants agreed to release their rights to the property and their counterclaims against Westergren. All of the parties later memorialized the settlement in a written Mediated Settlement Agreement (MSA), in which Westergren and the defendants agreed to release any *lis pendens* and all claims asserted by and between the parties, including any cross-claims and counterclaims, and NPH agreed to purchase the property. Separately, in exchange for Westergren's agreement to settle the lawsuit, release the *lis pendens*, and allow NPH to purchase the property, Plank orally promised

Westergren that he would become a partner with Plank and his brother Michael, who was president of NPH's corporate general partner, and would receive $1 million plus an interest in the profits from NPH's development and future sale of the property (the oral contract). The MSA did not memorialize the oral promises that Plank made to Westergren. After Westergren released the *lis pendens* and the parties dismissed the suit, NPH and an affiliated company purchased the property. A few months later NPH sold 20 of the 190 acres. When Westergren asked for the promised $1 million and a share of the profits, Plank replied that they could only pay Westergren $500,000 "right now."

When Plank and Westergren later met, Plank presented a $500,000 check from NPH, and in return, Westergren signed a release. The title of the document, stated in bold and underlined capital letters, read "**<u>AGREEMENT AND RELEASE</u>**." The release stated that Westergren agreed to relinquish any and all interest in the property and all claims against NPH, Michael Plank, and other listed parties in exchange for the total payment of $500,000. Without reading the release, Westergren signed it in front of a notary and accepted the check. Several months later, after Westergren had not received any additional payments, he reviewed the release and discovered what he had signed. When NPH, Plank, and Plank's brother Michael (collectively, the Plank parties) refused to make any additional payments, Westergren filed this suit against them, asserting claims for breach of the oral contract, breach of partnership duties, common law and statutory fraud, and attorney's fees. The Plank parties asserted that Westergren had released all claims by signing the release and that the oral contract was unenforceable under the statute of frauds. They also filed counterclaims for breach of contract, asserting that Westergren breached the MSA and the release by filing this suit against them.

The jury found in Westergren's favor on all claims, although it also found that the Plank parties' statutory and common law fraud caused Westergren "$0.00" damages. On the Plank parties' motion, however, the trial court granted a judgment notwithstanding the verdict and entered a take-nothing judgment as to all parties, assessing costs against Westergren. Westergren appealed and the Plank parties filed cross-appeals. With one justice dissenting, the court of appeals concluded, *inter alia*, that there was more than a scintilla of evidence to support the jury's findings that (1) an oral contract existed between Westergren and Plank, (2) Plank breached the oral contract, (3) NPH paid the $500,000 pursuant to the oral contract (not as consideration for the release), (4) this partial performance excepted the oral contract from the statute of frauds, (5) Plank fraudulently induced Westergren to sign the release, and (6) Westergren did not breach the MSA or the release by suing the Plank parties. Having found in Westergren's favor on his breach of contract claim, the court concluded that it did not need to address his claims for common law and statutory fraud and for breach of partnership duties. The court awarded costs to Westergren and remanded the case for a new trial on Westergren's claim for attorney's fees.

Before this Court, the Plank parties contend that the evidence was legally insufficient to support the jury's finding that Plank fraudulently induced Westergren to sign the release, the release was therefore valid and extinguished all claims under the oral contract, and the jury's related findings are thus irrelevant and cannot support the judgment. To overcome the jury's verdict, the Plank parties must show that there was no evidence to support the jury's finding of fraudulent inducement, no reasonable jury could conclude otherwise, and thus the release was valid as a matter of law. *Tanner*, 289 S.W.3d at 830.

Fraudulent inducement "is a particular species of fraud that arises only in the context of a contract." *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001). To prove that Plank fraudulently

4

induced him to sign the release, Westergren had to establish that (1) Plank "made a material representation"; (2) Plank's "representation was false and was either known to be false when made or made without knowledge of its truth"; (3) Plank's "representation was intended to be and was relied upon by the injured party"; and (4) Westergren's "injury complained of was caused by the reliance." *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 678 (Tex. 2009) (citing *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 436 (Tex. 1997)); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). The Plank parties argue that there is no evidence to establish the fourth element in this case. Specifically, they contend that no evidence supports a finding that Westergren's reliance on Plank's representations was "justifiable," because the release's plain language conflicted with Plank's representations, and Westergren had ample opportunity to read the release and chose not to do so.

At trial, Westergren admitted that he did not read the release before he signed it and accepted the $500,000 check. Specifically, he explained that:

- In a telephone conversation before the meeting at which Plank delivered the $500,000 check, Plank told Westergren that the check would be payment of the first half of the $1 million that Plank had promised in the oral contract;
- At the meeting, Plank never mentioned that the document was a release, and instead told Westergren that the release "was a receipt. It's nothing. You don't have to worry about it";
- Plank also told Westergren he would get "the other half" of the $1 million when "we get another building coming out of the ground";
- Westergren did not read the release because he was "in a hurry" and did not have his reading glasses with him;
- Although he wore a watch that had a magnifying glass, which he could have used to read the release, he did not use it;
- He did not ask Plank or the notary to read the release to him; and
- Instead, he relied on Plank's statements and representations and signed the release without reading it first.

Under the facts of this case, we agree with the Plank parties that Westergren could not justifiably rely on Plank's statements about the content of the release, which directly conflict with

5

the content of the release itself. On its face, the release's intent and effect is obvious and unambiguous. Consistent with its large, bolded, capitalized, and underlined title ("**<u>AGREEMENT AND RELEASE</u>**"), and utilizing bolded and capitalized key words within its text, the release provided that

> **WESTERGREN** . . . in consideration of the sum of **FIVE HUNDRED THOUSAND AND NO/100ths DOLLARS** ($<u>500,000.00</u>), and other good and valuable consideration, the receipt of which of considerations being hereby acknowledged and the adequacy of which considerations being hereby confessed, . . . does hereby fully and unconditionally **RELEASE AND FOREVER RELINQUISH** any and all right, title, and/or interest . . . in or to (i) . . . the "**<u>Subject Property</u>**;" . . . (ii) [NPH and certain affiliated companies] (collectively, the "**<u>Owning Entities</u>**"); and (iii) any income, rent, profits, or other proceeds related to [the property or the Owning Entities] . . . (collectively, the "**<u>Income and Proceeds</u>**") . . . .
>
> In addition, and for the same consideration, the receipt of which considerations being hereby acknowledged and the adequacy of which consideration being hereby confessed, Westergren . . . does hereby fully and unconditionally **REMISE, RELEASE AND FOREVER DISCHARGE** . . . **MICHAEL J. PLANK, THE PLANK COMPANIES, INC**., the Owning Entities, and [others] . . . of and from any and all manner of action and actions, cause and causes of action, and all claims and demands whatsoever, . . . which [Westergren] . . . can, shall or may have for, upon or by reason of any matter, cause [or] occurrence . . . proximately or remotely, from the beginning of the world to and through the day of the date of this release arising out of, relating to, or pertaining in any way, directly or indirectly, to: **<u>(i) the Subject Property; (ii) the Owning Entities; and (iii) the Income and Proceeds</u>**. This release is intended to release all liability described above of any character for damages of any type or nature . . . with respect to the matters released above.

Westergren chose not to read this release before he signed it in the presence of a notary and instead relied on Plank's representations regarding its contents. We hold that, as a matter of law, that reliance was not justifiable.

It is well-established that "[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him." RESTATEMENT (SECOND) OF TORTS § 541 (1977). Thus, as Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's

unambiguous terms. *See, e.g., Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962) ("In an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests . . . . [A] failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party.") (citation omitted). This is particularly true when the party had a reasonable opportunity to review the written agreement but failed to exercise ordinary care to do so. *See Tex. & Pac. Ry. Co. v. Poe*, 115 S.W.2d 591, 592 (1938) (holding that evidence was legally insufficient to support a finding of fraud where party who relied on oral statement that release was receipt had an opportunity to read the document which plainly identified itself as a release); *see also Thigpen*, 363 S.W.2d at 251.

The court of appeals concluded that Westergren did not have an adequate opportunity to review the release. Under these facts, we disagree. Westergren's testimony conclusively established that he had ample opportunity to read the release but instead chose to rely solely on Plank's representations because he was "in a hurry" and did not have his reading glasses with him.[1] Yet he acknowledged that he could have used the magnifier on his watch or had someone read the document to him, and no evidence indicates that anyone prevented him from doing so. *See* 409 S.W.3d 128, 151 (Frost, J., dissenting) (finding "no legal basis for the majority's conclusion" that Plank used "trickery or artifice" to prevent Westergren from reading the release). Instead of excusing a party's failure to read a contract when the party has an opportunity to do so, the law

---

[1] The court of appeals thought it relevant that Plank knew that Westergren had an attorney and had communicated with him but did not involve him in the drafting of the Release or send him a copy. 409 S.W.3d at 126–28. While these facts might be relevant to the issue of whether Westergren could *understand* the Release had he read it, we disagree that they could support a conclusion that he had no reasonable opportunity to *read* it. At a minimum, the language of the Release unambiguously made it clear that it was a "**RELEASE**," and that Westergren was releasing all claims to the property and against NPH and Michael Plank related to the property, and there is no basis to conclude that he was incapable of understanding that. In fact, Westergren's ability to understand the Release is not disputed, and his own testimony establishes that he was a sophisticated businessman who had personally participated in many contractual transactions. Any issue over whether he needed help to understand it would be irrelevant when, by his own admission, he made no effort to read it.

presumes that the party knows and accepts the contract terms. *See, e.g., Poe*, 115 S.W.2d at 592; *Indem. Ins. Co. of N. Am. v. W.L. Macatee & Sons*, 101 S.W.2d 553, 556 (1937); *cf. In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 232 (Tex. 2008); *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 133–34 (Tex. 2004); *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505 (Tex. 1993). Here, Westergren's decision not to read the release and instead to rely on Plank's representations because he did not have his glasses and was "in a hurry" was not justifiable.

As we have recently observed, it is not the courts' role "to protect parties from their own agreements." *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 810–11 (Tex. 2012). Thus, as the United States Supreme Court explained long ago:

> It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission.

*Upton v. Tribilcock*, 91 U.S. 45, 50 (1875); *see also Indem. Ins.*, 101 S.W.2d at 556 ("One is presumed to intend what he does or undertakes to do by the terms of a written instrument voluntarily signed by him."). We conclude that Westergren's evidence was legally insufficient to support the jury's finding that he justifiably relied on Plank's representations, and thus constitutes no evidence of fraudulent inducement to negate the release's validity.

However, the parties also dispute the scope of the release. In particular, the jury found that the oral contract was an agreement only between Westergren and Plank, in Plank's individual capacity, and Westergren argues that the release did not release any claims against Plank. We need not resolve this issue, however, because we agree with Plank's alternative argument that the oral contract is unenforceable under the statute of frauds. Under the statute of frauds, "a contract for the sale of real estate" is unenforceable unless it is in writing and signed by the person to be

8

charged. TEX. BUS. & COM. CODE § 26.01. Whether a contract comes within the statute of frauds is a question of law, which we review de novo. *Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 642 (Tex. 2013). Westergren concedes that the contract at issue was for the sale of real estate and was not in writing or signed, but he relies on the "partial performance exception" to the statute of frauds. Under this exception, he contends, an otherwise unenforceable oral contract becomes enforceable in equity if one party partially performs its obligations and "denial of enforcement would amount to a virtual fraud." Westergren contends that Plank partially performed his obligations under the oral contract by paying half of the promised $1 million payment, and thus the oral contract is enforceable in equity despite the statute of frauds.

Without adopting Westergren's description of the "partial performance exception,"[2] we conclude that, even under his theory, the exception does not apply here. As argued by Westergren, one of the exception's requirements is that the performance on which the party relies must be "*unequivocally referable* to the agreement." *Chevalier*, 213 S.W.2d at 533 (emphasis added). In other words, the purpose of the alleged acts of performance must be to fulfill a specific agreement. If the evidence establishes that the party who performed the act that is alleged to be partial performance could have done so for some reason other than to fulfill obligations under the oral contract, the exception is unavailable.

___

[2] On the few occasions that this Court has discussed this equitable exception to the statute of frauds, we have made it clear that it requires more than just one party's performance of some obligation under the alleged oral contract. *See, e.g., Chevalier v. Lane's, Inc.*, 213 S.W.2d 530, 533 (Tex. 1948) (noting that even "'full performance,' in the sense of full payment of the consideration by the purchaser, is held not to make the contract enforceable unless accompanied by other circumstances, such as change of possession and erection of valuable improvements"). For example, we explained that "to relieve a parol sale of land from the operation of the statute of frauds, three things were necessary: 1. Payment of the consideration, whether it be in money or services. 2. Possession by the vendee. And 3. The making by the vendee of valuable and permanent improvements upon the land with the consent of the vendor; or, without such improvements, the presence of such facts as would make the transaction a fraud upon the purchaser if it were not enforced. Payment of the consideration, though it be a payment in full, is not sufficient." *Hooks v. Bridgewater*, 229 S.W. 1114, 1116 (Tex. 1921). In light of Westergren's failure to establish that Plank's $500,000 payment was "unequivocally referable" to the oral contract, we need not and do not provide a complete explanation of *all* of the partial performance exception's requirements here.

9

Westergren contends that Plank's payment of $500,000 constitutes partial performance of the oral contract in which Plank agreed to pay $1 million, and that the payment is "unequivocally referable" only to that contract.[3] This is so, he contends, "because the release itself makes sense only in the context of an attempt to settle Westergren's claims based on the [oral contract]," and "the jury was free to conclude that the only thing the release might plausibly have sought to compromise was the [oral contract] itself." We disagree. The fact that the payment was made to "settle" and "compromise" Westergren's "claims based on the [oral contract]" does not mean it was made in performance of obligations under that contract. To the contrary, it establishes that the payment was made to *avoid* performance of the oral contract. On its face, the release states that Westergren's agreement to release all claims against the property, the "Owning Entities," and all "Income and Proceeds" was made "in consideration of the sum of **FIVE HUNDRED THOUSAND AND NO/100ths DOLLARS** ($500,000.00), and other good and valuable consideration, the receipt of which of considerations being hereby acknowledged and the adequacy of which considerations being hereby confessed." Contrary to Westergren's arguments, the payment cannot be unequivocally referable to the oral contract, because the release that Westergren signed expressly states that it was made in exchange for Westergren's agreement to the release. Furthermore, the payment could not be performance of the oral contract because it was made by NPH, which was not a party to the oral contract—but was a party to the release.

To find partial performance of the oral contract, the court of appeals relied upon Plank's oral representation that the payment was the first half of the $1 million owed under the oral contract. A party cannot rely upon oral representations to satisfy the partial performance exception,

---

[3] Westergren also contends that he fully performed the agreement by releasing the *lis pendens* and giving up his contractual right to the property. Like the $500,000 payment, these actions are not unequivocally referable to the oral contract where the MSA explicitly requires these acts by Westergren.

10

however. Rather, the kind of performance that justifies the exception to the statute of frauds is "performance which alone and *without the aid of words of promise* is unintelligible or at least extraordinary unless as an incident of ownership, assured, if not existing." *Chevalier*, 213 S.W.2d at 533 (emphasis added). The statute of frauds "unmistakably declares a policy that parol testimony is too unreliable for proof of certain types of agreement, and courts must give heed to that policy as well as to considerations of an equitable character." *Id*. Therefore, Westergren cannot rely on Plank's oral representations to support a finding that the payment was unequivocally referable to the oral contract. We hold that there is nothing in the nature of these acts that supports a jury finding of partial performance to except the oral contract from the statute of frauds.

In summary, we conclude that there is no evidence to support the jury's findings that Plank fraudulently induced Westergren to sign the release, or that the oral contract is excepted from the statute of frauds.

We now turn to Westergren's tort claims for common law fraud, statutory fraud, and breach of partnership duties. Although the jury found in favor of Westergren on the liability questions for his common law and statutory fraud claims, the jury awarded him no damages for either claim. Westergren did not appeal those findings. He therefore cannot recover damages on his fraud claims. With respect to his partnership claim, we have held that the oral contract in which Plank promised to make Westergren a partner with him and his brother is unenforceable under the statute of frauds. Westergren's claim for breach of partnership duties therefore must fail as well.

Finally, we turn to the Plank parties' argument that the court of appeals erred in affirming the trial court's take-nothing judgment on their counterclaims against Westergren for breach of the release and the MSA. The Plank parties contend that a party who releases a claim and later files suit on that claim necessarily breaches the release agreement. We disagree. Although the Plank

11

parties rely on a number of cases to support their argument, none of those cases reads a covenant not to sue into a release that does not include such a promise. They also rely on one case in which a court stated that a covenant not to sue can be construed as a release, arguing that the reverse must also be true. *See Dicker v. Lomas & Nettleton Fin. Corp.*, 576 S.W.2d 672, 675 (Tex. Civ. App.—Texarkana 1978, writ ref'd n.r.e.) (noting that "an agreement not to sue can be construed as a release"). Westergren, in turn, argues that the release provides only an affirmative defense because it provides only that it "may be pleaded as an absolute and final bar to any or all suit" and does not include an express or implied covenant not to sue or to indemnify the released parties. We must review the MSA and release language to determine whether either agreement includes a contractual obligation not to sue.

The intent of the MSA was to settle the suit between Westergren and the other parties to the initial litigation, who are not before the Court in this case. We find no language in the MSA in which Westergren agreed not to sue the Plank parties. In fact, the agreement contemplates that the parties may bring suit by providing that the parties "may not recover attorney's fees or costs in any litigation brought to construe or enforce this agreement. Otherwise, if unsuccessful, the prevailing party or parties shall be entitled to recover reasonable attorney's fees and expenses." This provision indicates that a suit may be brought, even though the agreement is in effect, and in no way suggests that filing a suit concerning the MSA's released claims results in a breach. Therefore, Westergren's claims did not breach the MSA.

We also find that the release is unambiguous as to this point. The parties intended the release "to release all liability described" within the agreement. Like the MSA, it includes no language barring Westergren from bringing suit or stating that he would breach the release by doing so. To the contrary, this agreement has a provision stating essentially that should a future

12

suit be brought, the release may be pleaded as an absolute bar to the suit—in other words, it provides the parties with an affirmative defense.[4] *See* TEX. R. CIV. P. 94 (listing affirmative defenses, including release). Although the release provides an affirmative defense to future suits, we cannot construe it as including a covenant not to sue where, in fact, the plain language does not bar future suits. Just as Westergren is bound to the actual language of the release, so are the Plank parties. The court of appeals, therefore, did not err in affirming the trial court's judgment based on the jury verdict in favor of Westergren on the Plank parties' claims for breach of the MSA and release.

We grant the Plank parties' petition for review, and without hearing oral argument, we (1) reverse the court of appeals' judgment as to Westergren's claim for breach of the oral contract, Westergren's claim for attorney's fees, and the trial court's allocation of court costs, (2) reinstate the trial court's judgment that Westergren take nothing on his claims for breach of the oral contract and for attorney's fees and the trial court's taxing of court costs against Westergren, and (3) affirm the court of appeals' take-nothing judgment on Westergren's partnership and fraud claims and on the Plank parties' counterclaims for breach of contract and attorney's fees against Westergren. TEX. R. APP. P. 59.1.

**Opinion Delivered:** January 9, 2015

---

[4] The release states that it "may be pleaded as an absolute and final bar to any or all suit or suits pending or which may hereafter be filed or prosecuted."