**AFFIRM in part; REVERSE and REMAND in part; and Opinion Filed March 15, 2019**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-01144-CV

### GREAT HANS, LLC, Appellant
### V.
### LIBERTY BANKERS LIFE INSURANCE CO., Appellee

**On Appeal from the 192nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-12254**

## MEMORANDUM OPINION
Before Justices Whitehill, Molberg, and Reichek
Opinion by Justice Reichek

Liberty Bankers Life Insurance Co. signed a contract to sell property in the U.S. Virgin Islands to Great Hans, LLC, but ultimately sold the property to another party. LBLIC then sued Great Hans seeking a declaration that their contract was not valid, binding, or enforceable. Great Hans counterclaimed for breach of contract, fraud, and conspiracy and sought declarations invalidating contractual clauses that limited LBLIC's liability and waived a jury.

The trial court granted LBLIC's motions for summary judgment and rendered a take-nothing judgment on Great Hans's claims.[1] In five issues, Great Hans challenges the trial court's rulings. For reasons set out below, we reverse the trial court's judgment on Great Hans's breach

---

[1] LBLIC nonsuited its claims for declaratory judgment and attorney's fees, making the judgment final.

of contract claim and remand the claim for further proceedings. We affirm the judgment in all other respects.

FACTUAL BACKGROUND

This case involves two private islands in the U.S. Virgin Islands—Great Hans Lollick Island and Little Hans Lollick Island—and a third parcel of land, Megan's Bay Lot (collectively "Islands"). LBLIC obtained an interest in the Islands through a mortgage loan it extended to an entity, referred to in the record as the "Tizes group," that later defaulted on the note. The Tizes group ultimately filed for bankruptcy, and the loan was modified to give the debtor an opportunity to sell the properties through a bankruptcy court-approved plan. Under this plan, LBLIC received the rights to the properties subject to an eighteen-month marketing process. LBLIC had deeds created conveying the right, title, and interest in the Islands to Liberty Life Service Corporation, a wholly owned subsidiary of LBLIC. The deeds were held in escrow during the marketing period and, if there were a default, LBLIC had the right to cause the deeds to be recorded in the U.S. Virgin Islands.[2]

The Tizes group did not sell the Islands and failed to pay off the debt. But LBLIC chose not to exercise its right to record the deeds immediately and take title to the property. Rather, in January 2013, the Tizes group entered an option agreement with another entity, Archipelago, LLC, to purchase the property, and LBLIC approved the agreement. So long as timely and regular payments were made to LBLIC, LBLIC agreed to not record the deeds and take the deeds in lieu of foreclosure. Ultimately, the sale did not go through because the payments were not timely made and LBLIC gave notice of default. Shortly after, Archipelago filed notices of interest in the

---

[2] Because the record provided little information regarding the prior bankruptcy, the facts related to the bankruptcy proceeding were taken from Great Hans's brief only to provide historical context. LBLIC has not challenged the accuracy of any of these facts. *See* TEX. R. APP. P. 38.1(g).

–2–

Islands, claiming an ownership interest in the property pursuant to the option agreement and creating a cloud on title. The Islands were deeded to LLSC, and LLSC recorded the deeds in lieu of foreclosure in September 2013.

After the option agreement failed, LBLIC went forward with a proposal by James Eckel, a real estate developer who expressed interest in purchasing the Islands while it was under option. Over the next several months, Eckel's attorney Peter Marullo and LBLIC negotiated several versions of an agreement, and Eckel formed Great Hans as a single-purpose entity to consummate the transaction. Although LLSC was actually the title owner, LBLIC and Great Hans signed a Purchase and Sale Agreement on November 4, 2013. By the date of signing, Great Hans was aware of the option agreement, Archipelago's filing of notices of interest, and the previous bankruptcy, but it was not actually aware that LLSC was the title owner.

Under the PSA, Great Hans agreed to pay $9.35 million for the Islands and the Megan's Bay lot with $4.67 million to be delivered to the title company on or before closing and the balance to be seller-financed. The PSA provided for a sixty-day feasibility period with a closing date to follow thirty days later. In apparent recognition of the ongoing title issue created by Archipelago's filing of notices of interest, the PSA also included a provision obligating LBLIC to use "commercially reasonable efforts" to defend against claims by a prior owner, option holder, or debtor or creditor in the original bankruptcy case that asserted a claim, right, or interest to purchase the Islands. The provision provided an additional year for LBLIC to resolve any title issues and, if unsuccessful, gave Great Hans the option of terminating the contract or proceeding to closing. The PSA also contained two other provisions relevant to this appeal: (1) a waiver of jury trial and (2) a limitation on damages if LBLIC defaulted and specific performance was unavailable.

Great Hans paid $250,000 in escrow as called for by the PSA. Also, in accordance with the PSA, Great Hans requested a title report. Less than two weeks later, the title company

circulated a title commitment on the transaction. The commitment showed the interest in the property was vested in LLSC and required an amendment to the PSA correcting the seller's name to LLSC. It also contained several exceptions.

Once the PSA was executed, LBLIC notified Archipelago it had a contract with another buyer, which predictably resulted in litigation between the parties in early 2014. In that suit, LBLIC took the position Archipelago no longer had a right to put cloud on the title because its option was gone.

Over the next several weeks, Great Hans and LBLIC twice agreed to amend the PSA to extend the feasibility and title objection periods.[3] The feasibility period was extended to March 7, 2014, which then made the closing date April 6, 2014, subject to any other provisions of the PSA,[4] and title objections were due March 4, 2014. On March 3, Great Hans gave written notice of its objections to certain exceptions in the title report, including the Archipelago litigation. LBLIC, through its counsel, Jay LaJone, responded in writing. With respect to the pending litigation, LaJone said "we will need to address how it is to be treated. My initial feeling is that we make it subject to the same provisions in the Contract regarding the Option Agreement, but I need to discuss this with my client." LaJone further stated until the issues were resolved, LBLIC reserved the right to indicate which objections it could cure.

In March, after the feasibility period expired and Great Hans had not terminated the transaction, LBLIC requested that $100,000 of the escrow deposit be released to it. Great Hans authorized the release because it intended to purchase the property. The transaction, however, did not close on April 6 because LBLIC could not convey good title. Great Hans believed the "contract

---

[3] At the time of the second amendment in February 2014, the parties had received the revised title commitment, which again showed LLSC as the fee simple owner of the properties.

[4] Although the amendments use the term "Inspection Period," it is undisputed this referred to the feasibility period.

–4–

continued" and LBLIC was still working to clear the title defects caused by the Archipelago litigation. But, shortly after that date, Great Hans said it no longer received updates from LBLIC.

During this same timeframe in March 2014, Bradford Phillips, president of LBLIC, was contacted by yet another company, U.S. Virgin Islands Properties, LLC, which was also interested in buying the Islands. Phillips did not tell the company that the Islands were under contract and did not tell Great Hans about the new potential buyer. Rather, in September 2014, LBLIC settled the Archipelago litigation, and that same month, LLSC transferred the Islands to USVIP, who paid $23 million. Phillips said the USVIP transaction was a "better transaction" because it was a higher purchase price and all cash. LBLIC did not inform Great Hans that there was another bidder on the property, that the Archipelago litigation had settled, or that the Islands were sold to another buyer.

A month after the sale, LBLIC sued Great Hans, seeking a declaratory judgment that the PSA was not a valid, binding, or enforceable contract. Great Hans filed an answer asserting a general denial and affirmative defenses. Additionally, it filed a counterclaim alleging LBLIC breached the PSA, engaged in fraud and conspiracy, and sought declarations invalidating the contractual provisions waiving a jury trial and limiting LBLIC's liability. Great Hans claimed damages of at least $13.65 million, which is the difference between the price it would have paid for the Islands and what USVIP paid for the Islands.

LBLIC filed traditional and no-evidence motions for summary judgment on Great Hans's counterclaims. The trial court granted the motions and (1) struck Great Hans's demand for a jury, (2) rendered a take-nothing judgment on all of Great Hans's counterclaims, and (3) alternatively declared the "liquidated damages clause" was reasonable and enforceable. This appeal followed.

STANDARD OF REVIEW

We review an order granting summary judgment de novo. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

When reviewing a traditional summary judgment in favor of a defendant, we determine whether the defendant conclusively disproved an element of the plaintiff's claim or conclusively proved every element of an affirmative defense. *Durham v. Children's Med. Ctr. of Dallas*, 488 S.W.3d 485, 489 (Tex. App.—Dallas 2016, pet. denied). A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence. *Id*. We take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex. 2017).

In a no-evidence motion for summary judgment, the movant need only allege there is no evidence to support an essential element of a claim on which a nonmovant has the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Sw. Elec. Power v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002). Once that occurs, the burden shifts to the nonmovant to present evidence that raises a fact issue on the challenged elements. TEX. R. CIV. P. 166a(i); *Swan v. GR Fabrication, LLC*, No. 05-17-00827-CV, 2018 WL 1959486, at *1 (Tex. App.—Dallas Apr. 26, 2018, no pet.) (mem. op.). The nonmovant will defeat a no-evidence summary judgment by presenting more than a scintilla of evidence to raise a genuine issue of material fact. *Swan*, 2018 WL 1959486, at *1. More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

"[I]f a no-evidence motion for summary judgment and a traditional motion for summary judgment are filed which respectively asserts the plaintiff has no evidence of an element of its

claim and alternatively asserts that the movant has conclusively negated that same element of the claim, we address the no-evidence motion for summary judgment first." *Cooper v. M.N. Gumbert Corp.*, No. 04-17-00833-CV, 2018 WL 4470748, at *2 (Tex. App.—San Antonio Sept. 19, 2018, pet. denied.) (mem. op.) (quoting *Williams v. Parker*, 472 S.W.3d 467, 469–70 (Tex. App.—Waco 2015, no pet.)). But if the traditional motion challenges a cause of action on an independent ground, we consider that ground first "because it would be unnecessary to address whether a plaintiff met his burden as to the no-evidence challenge if the cause of action is barred as a matter of law." *Id.* (citing *Lotito v. Knife River Corp.-S.*, 391 S.W.3d 226, 227 n.2 (Tex. App.—Waco 2012, no pet.) ); *Union Pac. R.R. Co. v. Brown*, No. 04-17-00788-CV, 2018 WL 6624507, at *2 (Tex. App.—San Antonio Dec. 19, 2018, no pet.).

BREACH OF CONTRACT

Great Hans first challenges the trial court's take-nothing summary judgment on its breach of contract claim, which centered on LBLIC's sale of the Islands to a third party, USVIP, during a time in which Great Hans argues it had the Islands under contract.

With respect to this claim, the trial court determined the contract terminated on the original closing date of April 6, 2014, which was months before LBLIC (1) settled the Archipelago litigation and (2) sold the Islands to a different party. Great Hans argues this ruling was error because the PSA contained a provision, paragraph 5(a)(iii), which effectively extended the closing date for one year so that title claims, such as the Archipelago litigation, could be resolved. LBLIC counters that paragraph 5(a)(iii) is not controlling and relies on other provisions, paragraphs 5(a)(ii) and (iv), to support its contention that the PSA terminated by its own terms when closing did not occur on April 6, 2014. Consequently, it contends there was no contract in effect at the time of the alleged breach in September 2014 when the Islands were sold.

A successful breach of contract claim requires proof of the following elements: (1) a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendants, and (4) damages sustained by the plaintiff as a result of that breach. *See Petras v. Criswell*, 248 S.W.3d 471, 477 (Tex. App.—Dallas 2008, no pet.).

In construing contracts, we must ascertain and give effect to the parties' intentions as expressed in the document. *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 63 (Tex. 2015). We attempt to harmonize all contractual provisions by analyzing the provisions with reference to the whole agreement. *Id.* We "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served," and, when possible and proper, we avoid a "construction which is unreasonable, inequitable, and oppressive." *Id.* (quoting *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex. 1987)). If, through the use of relevant rules of construction, the contract can be given a definite meaning, we construe it as a matter of law. *Id.* at 63–64.

Paragraph 5 of the PSA addressed issues related to title insurance and liens. Under subparagraph (i), the parties agreed Great Hans would obtain a title commitment for insurance and then notify LBLIC of its objections to any title matters. The remaining provisions provided as follows:

> (ii) Seller shall have ten (10) business days after its receipt of the Title Objections to determine whether it will cure the Title Objections ("Seller's Response Notice"). If Seller can or will not cure all of Purchaser's Title Objections other than claims of Prior Owner Parties as hereinafter defined (the "Real Estate Title Objections"), Purchaser shall then have ten (10) business days to notify such Seller of its intention to either (i) terminate this Agreement, in which event, the entire Escrow Deposit shall be returned to Purchaser, or (ii) proceed to Closing and accept title to Islands subject to the Real Estate Title Objections, without any liability or obligation on the part of Seller by reason of such Real Estate Title Objections. Property Taxes and accepted Real Estate Title Objections shall be referred to herein as "Permitted Exceptions".

> (iii) . . . Seller shall also use commercially reasonable efforts to defend against any claims made by any prior owner, mortgagor, contract vendee,

option holder or any debtor or creditor in the Bankruptcy Case or other party asserting a claim, interest or right to purchase the Property (a "Title Claim"). As used herein, "commercially reasonable efforts" shall include defending any litigation regarding a Title Claim; provided, however, if such matter is not resolved and removed from the Title Commitment by the date that is one (1) year from the original Closing Date ("Remediation Date"), Purchaser shall have the option to elect, by written notice to Seller within ten (10) business days of the Remediation Date, to (i) proceed to Closing, subject to such Title Claim without any adjustment to the Purchase Price, in which event Seller shall cause the Liberty Mortgages to be assigned to a designee of Purchaser, or (ii) terminate this Agreement, in which event Purchaser would receive the release of the entire $250,000 Escrow Deposit, plus receive the lesser of ("Expense Reimbursement") (aa) Purchaser's documented out-of-pocket expenses incurred in this transaction (including, without limitation, any legal expenses incurred by Purchaser in defending litigation brought by anyone asserting a Title Claim), or (bb) $50,000. In the event Purchaser elects option (i) above, Closing shall be ten (10) business days after Purchaser gives notice of such election. If Seller is required to remove a Monetary Lien pursuant to the terms of this Agreement, Seller shall be entitled to postpone the Closing for a period of thirty (30) days in order to endeavor to remove such Monetary Lien unless Purchaser agrees to a longer postponement.

(iv)    Notwithstanding anything to the contrary contained herein, if a Seller is unable to eliminate the Title Objections other than Monetary Liens which Seller is obligated to remove by the Closing Date (as hereinafter defined), unless the same are waived by Purchaser, such Seller may, upon prior notice ("Title Cure Notice") to Purchaser, adjourn the Closing Date for a period not to exceed thirty (30) days (inclusive of any adjournment taken pursuant to (iii) above) ("Title Cure Period"), in order to attempt to eliminate such exceptions. Purchaser may extend the time to cure the Title Objections in Purchaser's discretion by not for more than 30 days without Seller's approval.

In its supplemental motion for summary judgment and in its brief on appeal, LBLIC argues that subparagraphs (ii) and (iv) govern this case and demonstrate the contract terminated in April 2014. Subparagraph (ii) governed certain title objections for which LBLIC either could not or would not cure. LBLIC argues it never agreed to cure the Archipelago litigation, leaving Great Hans the option to terminate the contract or proceed to closing. LBLIC contends that because Great Hans did not terminate the contract, it necessarily elected to proceed to closing. When Great Hans failed to close on April 6, LBLIC contends the contract expired by its own terms. We cannot agree.

LBLIC's argument presumes the Archipelago litigation was a "Title Objection" for purposes of determining Great Hans's options when LBLIC decided not to cure. But "claims of Prior Owner Parties" were specifically removed from the definition of "Title Objection" governed by subparagraph (ii), and it is undisputed that the Archipelago litigation was a claim by a prior owner. So, while subparagraph (ii) clearly put Great Hans to a decision if LBLIC did not agree to cure a title objection, the specific title objection at issue here was eliminated from its application. Consequently, subparagraph (ii) does not apply.

LBLIC argues that even if it had agreed to cure the Archipelago litigation objection but was unable to do so, subparagraph (iv) gave it, not Great Hans, the option to extend the time to cure, which it never did. But, again, subparagraph (iv) has limited application. It applies only to title objections, other than monetary liens, which LBLIC was "obligated to remove by the Closing Date." The contract defined "Closing Date" as thirty days after the feasibility period ended, or April 6. Whether LBLIC was obligated to remove the Archipelago litigation by that date, however, requires consideration of subparagraph (iii).

Unlike subparagraphs (ii) and (iv), subparagraph (iii) specifically addressed "Title Claims," defines the term, and sets out the seller's obligations and the buyer's corresponding options. The provision obligated LBLIC to use commercially reasonable efforts to defend a title claim. A title claim was defined as including a claim by a prior owner or other party asserting a claim, interest, or right to purchase the property. LBLIC's obligation included defending litigation regarding such a claim, but, if the matter was not resolved within a year from the original closing date, the buyer could proceed to closing subject to the title claim or terminate the agreement, receive a release of the entire escrow deposit plus the lesser of purchaser's out-of-pocket expenses incurred in the transaction or $50,000.

Thus, subparagraph (iii) in effect extended the contract for one year to allow LBLIC to resolve title claims. Here, it is undisputed that the Archipelago entities made a claim against the property by filing notices of interest which subsequently resulted in a lawsuit in the U.S. Virgin Islands. That claim triggered LBLIC's obligation to defend against the claim for up to a year after the original closing date, i.e., the "remediation period." Given the language of the contract, the parties intended the contract to remain in effect during the remediation period or there would have been no need to provide a term for the buyer to make an election to either close or terminate at the end of the year.

On appeal, LBLIC does not dispute it had a contractual obligation to defend against title claims; rather, it argues the provision does not apply because Great Hans failed to invoke it. In particular, LBLIC urges that Great Hans had to give "written notice" and "adjourn" the closing to wait for the one-year period to run. But LBLIC does not identify a contractual provision requiring such action on Great Hans's part and the provision itself contains no such demand. Moreover, the evidence shows Great Hans timely notified LBLIC of its objections to title, which included the Archipelago litigation.

For the above reasons, we conclude LBLIC's interpretation of the contract is not reasonable because neither subparagraph (ii) nor (iv) apply to the circumstances before us. By its plain language, subparagraph (iii) extended the contract for up to one year and essentially provided protection for both the buyer and the seller, giving both an end date by which (1) the seller could end its obligation to defend against title claims and (2) the purchaser could elect to proceed to closing or terminate the contract. Consequently, the trial court's determination that the contract terminated on April 6, 2014, based on an application of subparagraphs (ii) and (iv), was error. We sustain Great Hans's issue related to the trial court's summary judgment on its breach of contract claim.

Great Hans next argues the trial court erred by granting summary judgment that denies it specific performance under the contract. LBLIC sought summary judgment on Great Hans's request for specific performance on the ground that this relief was not available because LBLIC does not own the property.

Specific performance will not be decreed where it appears that performance of the contract by the defendant is impossible. *Nash v. Conatser*, 410 S.W.2d 512, 519 (Tex. App.—Dallas 1966, no writ). Thus, where the defendant does not own the land involved in the agreement, he may not be compelled to perform. *Id*. This is true even though the want of title is due to the defendant's own act. *O'Neill v. Powell*, 470 S.W.2d 775, 779 (Tex. App.—Fort Worth 1971, writ ref'd n.r.e.).

Here, the evidence is undisputed that LBLIC does not own the property at issue. Although this is the basis for LBLIC's summary judgment, Great Hans has not addressed the fact that LBLIC no longer owns the property, argued any exception, or provided any analysis as to how it can receive the relief it requests. Because Great Hans has not shown reversible error, we overrule this issue.

## FRAUD

Great Hans next challenges the trial court's summary judgment on its claims for statutory fraud, common law fraud, and fraud in the inducement,[5] all of which arose out of the contract. Generally, Great Hans complains LBLIC induced it to enter the PSA by falsely representing it owned the property and, once the contract was executed and pending, LBLIC represented it was

---

[5] Great Hans also alleged fraudulent transfer but has not challenged the trial court's take-nothing judgment on this claim.

attempting to clear title so the PSA could be concluded but instead failed to disclose it had settled the Archipelago litigation and sold the property to another buyer.[6]

In its motion for summary judgment, LBLIC asserted that the economic loss rule barred all fraud claims because Great Hans had not alleged an economic injury independent and separate from the economic losses recoverable under breach of contract.

Great Hans first argues LBLIC's ground "turned on an 'allegation' in the pleading" and therefore should have been challenged by special exception, not summary judgment. But LBLIC did specially except to the fraud claims earlier in the lawsuit and included an exception regarding the economic loss rule. The trial court granted LBLIC's special exceptions and ordered Great Hans to replead by stating "the type of fraud, the misrepresentations or omissions complained of, who made them and when they were made." After that, Great Hans amended its pleadings multiple times, once with leave of court. Accordingly, we conclude this argument is without merit.

Great Hans next addresses the substance of the doctrine in a mere seven sentences in its brief. Great Hans broadly asserts the doctrine does not apply to fraud claims but provides only a general discussion that is limited to fraud in the inducement. Within its issue, Great Hans does not consider the application of the doctrine to any specific misrepresentation or omission.

The economic loss rule has been described as "one of the most confusing doctrines in tort law." R. Joseph Barton, Note, *Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims*, 41 WM. & MARY L. REV. 1789, 1789 (2000). It provides that when a party's acts breach a contract and the only alleged injury is economic loss to the subject of the contract itself, the action sounds in contract alone. *Sw. Bell*

---

[6] In its brief, Great Hans argues all of its fraud claims together, without identifying with any clarity which claim or element is being addressed and, most importantly, the specific misrepresentation or omission that forms the basis for any particular claim. This scattershot approach has left the Court in the position of sorting through the argument to determine what issue has actually been raised. Briefs are meant to acquaint the Court with a case's subject matter. Briefs should not require the Court "to connect unrelated dots, hunt down relevant authority, or speculate as to what exactly it is a party is attempting to argue or what relief it is requesting." *Brazos Elec. Power Coop., Inc. v. Tex. Comm'n on Envt'l Quality*, 538 S.W.3d 666, 700 (Tex. App.—El Paso 2017, pet. filed). Nevertheless, after reviewing the third amended counterclaim, Great Hans's response to the motion for summary judgment, and Great Hans's brief, it appears the only allegations properly before us are those noted above.

*Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex. 1991). Thus, tort damages are generally not recoverable unless the plaintiff suffers an injury that is independent and separate from the economic losses recoverable under a breach of contract claim. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 45–47 (Tex. 1998); *DeLanney*, 809 S.W.2d at 494 (analyzing both source of duty and nature of remedy in determining claim's characterization as sounding either in contract or tort). The rule, however, does not apply to fraudulent inducement claims. *See Formosa*, 960 S.W.2d at 47. Tort damages are recoverable for fraudulent inducement irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract. *Id*.; *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 302–303 (Tex. App.—Dallas 2009, no pet.). Thus, to the extent Great Hans complains it was induced to enter the PSA by LBLIC's claim it owned the property, summary judgment would have been improper on this particular allegation. *See Formosa*, 960 S.W.2d at 47; *Esty*, 298 S.W.3d at 302–03

Great Hans, however, has not attempted to explain why its claims for fraud in the performance of the contract (failures to disclose the Archipelago settlement and the sale to USVIP) are not barred by the economic loss rule under the particular facts of this case. We therefore conclude Great Hans failed to effectively challenge LBLIC's ground that the economic loss rule barred these claims and will not disturb the summary judgment with respect to Great Hans's claims alleging nondisclosure of the Archipelago settlement and the sale to USVIP. *See Staton Holdings, Inc. v. Tatum, L.L.C.*, 345 S.W.3d 729, 732–33 (Tex. App.—Dallas 2011, pet. denied) (concluding economic loss issue waived when appellant's brief consisted only of abstract discussion of law without explaining why rule barred claims under facts of case); *Adams v. First Nat'l Bank of Bells/Savoy*, 154 S.W.3d 859, 875 (Tex. App.—Dallas 2005, no pet.) ("[A] reviewing court will

affirm the summary judgment as to a particular claim if an appellant does not present argument challenging all grounds on which summary judgment could have been granted.").

Although the economic loss rule does not bar Great Hans's fraud in the inducement claim, assuming that Great Hans raised a fact issue on the claim's elements, the record establishes that the trial court did not err in granting summary judgment on this claim for another reason—the affirmative defense of ratification.

The elements of ratification are (1) approval by act, word, or conduct, (2) with full knowledge of the facts of the earlier act, (3) with intent to validate the earlier act. *Neese v. Lyon*, 479 S.W.3d 368, 384 (Tex. App.—Dallas 2015, no pet.). A party ratifies an agreement when, after learning of all of the material facts, he confirms or adopts an earlier act that did not then legally bind him and that he could have repudiated. *Id.* Knowledge or notice to an attorney, acquired during the existence of the attorney-client relationship and while acting within the scope of his authority, is imputed to the client. *Lehrer v. Zwernemann*, 14 S.W.3d 775, 778 (Tex. App.—Houston [1st Dist.] 2000, pet. denied).

As part of its traditional summary judgment, LBLIC presented evidence that in November 2013, Great Hans's attorney, Peter Marullo, requested and received a title commitment from Freedom Abstract on the Islands that showed fee simple title interest in the property was vested in LLSC, not LBLIC. The title commitment further required an amendment to the PSA correcting the seller's name to LLSC. As Great Hans's lawyer, Marullo's knowledge was imputed to Great Hans, meaning that just days after execution of the contract, Great Hans was charged with the knowledge that LLSC held title to the property. *See Lehrer*, 14 S.W.3d at 778. Several weeks later, Great Hans executed two amendments to the PSA, extending the feasibility and title objection periods. So, while Great Hans may have been unaware that LBLIC did not hold legal title to the property at the time PSA was executed, it was aware (through its attorney) of that fact

only days later and certainly weeks before it executed amendments to the PSA. Given these facts, we conclude LBLIC conclusively established its affirmative defense of ratification, and the trial court therefore did not err in granting summary judgment on this claim.

Moreover, these same facts establish as a matter of law a lack of reliance on the representation by Great Hans. Both common law and statutory fraud require that Great Hans show actual and justifiable reliance. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 182 (Tex. 1997); *Coldwell Banker Whiteside Assocs. v. Ryan Equity Partners, Ltd.*, 181 S.W.3d 879, 888 (Tex. App.—Dallas 2006, no pet.). "If the person to whom a false representation is made is aware of the truth, it is obvious that he is neither deceived nor defrauded, and therefore, any loss he may sustain is not traceable to the representation but is self-inflicted." *Bynum v. Signal Life Ins. Co.*, 522 S.W.2d 696, 700 (Tex. App.—Dallas 1975, writ ref'd n.r.e.). We overrule Great Hans's issue challenging the summary judgment on its fraud claims.

CONSPIRACY

Great Hans next contends summary judgment should have been denied on its civil conspiracy claim. In its motion for summary judgment, LBLIC asserted that the conspiracy claim failed because there is no underlying tort. Liability for conspiracy is predicated on the commission of an underlying tort. *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) (orig. proceeding) (op. on reh'g). Having concluded the trial court did not err in granting summary judgment on Great Hans's fraud claims, there are no underlying tort claims at issue. Consequently, the trial court did not err in granting summary judgment on this claim. We overrule the fourth issue.

DECLARATORY JUDGMENT CLAIMS

Finally, Great Hans contends the trial court erred in granting summary judgment declaring as valid and enforceable the limitation of liability and jury waiver clauses in the PSA.

We begin with the limitation of liability clause. Paragraph 18(b) of the PSA provides:

–16–

If Seller defaults under this Agreement, Purchaser shall be entitled to either (1) termination of this Agreement and receive the return of the entire $250,000 Escrow Deposit, or (2) enforce specific performance. These shall be Purchaser's exclusive remedies, unless as a result of Seller's intentional action, specific performance is unavailable, in which case, in addition to receiving the return of the entire $250,000 Escrow Deposit, Purchaser shall be entitled to receive damages in the amount of $500,000, which shall include any legal fees or costs of Purchaser.

Great Hans alleged the provision, limiting LBLIC's liability when specific performance was unavailable due to LBLIC's intentional conduct, is "unconscionable, void, and unenforceable as violating public policy." The trial court, however, determined the provision was reasonable and enforceable.

Texas has long recognized the "strongly embedded public policy favoring freedom of contract." *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, No. 17-0578, 2019 WL 406075, at *11 (Tex. Feb. 1, 2019). Absent a compelling reason, courts must respect and enforce the terms of a contract that the parties have freely and voluntarily made. *Id*. As the Texas Supreme Court has noted: "Freedom of contract is a policy of individual self-determination; individuals can control their destiny and structure their business transactions through agreements with other competent adults of equal bargaining power, absent violation of law or public policy." *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 482 (Tex. 2017). A damages-limitation clause is a limited warranty that is the basis of the bargain and will limit recovery to the limited damages. *Bombardier*, 2019 WL 40675, at *11. Limitation of liability clauses are generally valid and enforceable. *Id*. at 12.

Here, Great Hans's argument is underpinned by its belief that the contract was procured by fraud. It argues since "fraud vitiates every transaction tainted by it," a "stipulated damage provision in a contract obtained by fraud cannot be enforced." But the supreme court recently rejected a similar argument: "We have never held . . . that fraud vitiates a limitation-of-liability clause. We must respect and enforce terms of a contract that parties have freely and voluntarily

entered." *Id*. at * 12. Moreover, we have concluded that summary judgment was proper on Great Hans's fraud claims; therefore, the foundation for its argument no longer exists. The record shows the parties, who were sophisticated entities represented by counsel in an arms-length transaction, negotiated the PSA over several months and numerous versions and bargained for the limitation of liability clause to limit the damages recoverable in the event the seller intentionally breached and specific performance was unavailable. We therefore conclude, as did the trial court, that the clause is valid and enforceable.

We also reject Great Hans's challenge to the trial court's summary judgment on the contractual jury waiver provision. This provision is found in Paragraph 20(p) of the PSA:

> SELLER AND PURCHASER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR COUNTERCLAIM ARISING IN CONNECTION WITH, OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT.

A party may waive its constitutional right to a jury trial. Contractual jury waivers do not violate public policy and are enforceable as long as the waiver is voluntary, knowing, and intelligent, and with full awareness of the legal consequences. *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 132 (Tex. 2004) (orig. proceeding); *In re Key Equip. Fin. Inc.* 371 S.W.3d 296, 301 (Tex. App.—Houston [1st Dist.] 2012, orig. proceeding). A conspicuous jury waiver provision is "prima facie evidence of a knowing and voluntary waiver and shifts the burden to the opposing party to rebut it." *In re Gen. Elec. Capital Corp.*, 203 S.W.3d 314, 316 (Tex. 2006) (orig. proceeding) (per curiam). Under the business and commerce code, conspicuous means "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it." TEX. BUS. & COM. CODE ANN. § 1.201(b)(10); *In re Bank of Am., N.A.*, 278 S.W.3d 342, 344 (Tex. 2009) (orig. proceeding). We presume that "a party who signs a contract knows its contents." *In re Bank of Am.*, 278 S.W.3d at 344.

The jury waiver clause here was one of eight provisions on the page. The provisions are single-spaced, set apart by double spacing, and separately numbered. The jury waiver was contained in a separate paragraph and stood out on the page as the only provision in all capital letters. It was not printed in small type or hidden in lengthy text. The waiver was followed by a provision in which the parties expressly acknowledged that they or their counsel had reviewed and revised the agreement.

We conclude the clause was conspicuous and therefore served as prima facie evidence that Great Hans knowingly and voluntarily waived its right to a jury trial. *See In re Gen. Elec.*, 203 S.W.3d at 316 (concluding provision in capital letters in bold print was prima facie evidence of knowing and voluntary waiver). Although the burden shifted to Great Hans to raise a fact issue, it has directed us to no evidence in rebuttal. To the extent Great Hans argues the provision is "tainted by fraud," we again note that we have affirmed the take-nothing judgment on Great Hans's fraud claims. Further, as noted above, the summary judgment evidence showed the parties were represented by counsel, negotiated the contract over several months, and went through several versions before signing the agreement at issue. We conclude the trial court did not err in granting summary judgment on this claim. We overrule Great Hans's issue related to the summary judgment on its declaratory judgment claims.

CONCLUSION

We reverse the trial court's judgment with respect to Great Han's breach of contract claim and remand that claim for further proceedings consistent with this opinion. We affirm the trial court's judgment in all other respects.


/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE


171144F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

GREAT HANS, LLC, Appellant

No. 05-17-01144-CV      V.

LIBERTY BANKERS LIFE INSURANCE
CO., Appellee

On Appeal from the 192nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-14-12254.
Opinion delivered by Justice Reichek;
Justices Whitehill and Molberg
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part.

We **REVERSE** that portion of the trial court's judgment granting summary judgment for appellee Liberty Bankers Life Insurance Co. on appellant Great Hans, LLC's breach of contract claim. In all other respects, the trial court's judgment is **AFFIRMED**. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered March 15, 2019.